**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**UNITED STATES OF AMERICA,**

v.  Criminal Action No. 5:25-CR-34
(BAILEY)

**PAUL J. HARRIS,**

        Defendant.

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS
GOVERNMENT CONDUCT**

Comes now the United States of America and Matthew L. Harvey, United States Attorney for the Northern District of West Virginia, by Jarod J. Douglas and Jennifer T. Conklin, Assistant United States Attorneys for said District, and responds in opposition to the defendant's Motion to Dismiss Indictment for Outrageous Government Conduct [Doc. 85].

## I.  BACKGROUND

### A. Indictment's Allegations

The indictment charges the defendant, an attorney, with mail and wire fraud arising from his alleged fraudulent obtaining and mishandling of client funds, including his commingling of client funds with non-client funds in his law firm operating account and his conversion of client funds to his own use [Doc. 1]. As relevant here, the indictment summarizes the defendant's representation of CLIENT-3 as follows:

> CLIENT-3 was a client for whom **PAUL J. HARRIS** agreed to handle the first-party and third-party claims arising from a mine subsidence dispute, on a contingency fee basis, and to assist CLIENT-3 in curing income tax and child support delinquencies, for no additional fee.  In or about November 2020, CLIENT-3 transferred $300,000 to the IOLTA account of **PAUL J. HARRIS** to

1

>be used to cure the income tax and child support delinquencies. In or about March 2021, as part of a settlement of the first-party claim, an insurance company issued a check of $200,000, made payable to **PAUL J. HARRIS** and CLIENT-3, which was deposited in the IOLTA account of **PAUL J. HARRIS**. In or about April 2021, CLIENT-3 transferred over $600,000 to the IOLTA account of **PAUL J. HARRIS** to be used to cure the income tax and child support delinquencies.
>
>CLIENT-4 was a member of a class of plaintiffs that **PAUL J. HARRIS** agreed to represent in a civil action filed in or about April 2021. In or about November 2022, as part of a settlement, the defendant in the civil action issued checks payable to the plaintiffs totaling $3,500,000, all of which were deposited in the IOLTA account of **PAUL J. HARRIS**, including a check of $1,000,000 made payable to CLIENT-4.

Id. at p. 3, ¶¶ 7–8.

The indictment alleges that the defendant commingled and then converted to his own use all the client funds of CLIENT-3, including using the over $600,000 transfer received in April 2021 to trade in a brokerage account, purchase cryptocurrency, and pay off the loan on his law firm building. Id. at pp. 8–9, ¶¶ 29–31. The indictment alleges that in August 2022, the defendant "represented falsely to CLIENT-3's son that he had paid the outstanding tax liabilities by producing and causing to be produced to CLIENT-3's son, at Harris Law Offices, a copy of CLIENT-3's file, which included copies of state and federal income tax returns and copies of payment checks dated between March 29, 2022, and April 30, 2022." Id. at p. 10, ¶ 37. The indictment alleges that in January 2023 and March 2023, the defendant used settlement funds from the class action involving CLIENT-4 to fund the checks for the federal income taxes of CLIENT-3 and his daughter, copies of which checks the defendant had produced to the son of CLIENT-3 in August 2022 as already paid. Id. at p. 12, ¶¶ 48, 50.

The indictment pleads these allegations in support of charges for mail and wire fraud. In this regard, the indictment alleges that the defendant devised a scheme to defraud and obtain money

2

from clients by means of materially false and fraudulent pretenses, representations, and promises. Id. at p. 4, ¶ 2.  The indictment alleges that the scheme involved commingling and converting client's funds to his own use and making false and misleading statements to his clients to conceal his misuse of client funds and to lull and forestall action by his clients.  Id. at p. 5, ¶¶ 5, 7.  As relevant here, Counts 4 through 16 of the indictment charges the defendant with mail fraud for mailing the tax payments in January 2023 and March 2023, as follows:

| 4 | 01/23/2023 | Check of $45,718.65 made payable to the U.S. Treasury for the taxes of the daughter of CLIENT-3 mailed to the Internal Revenue Service |
|---|---|---|
| 5 | 01/24/2023 | Check of $26,208.19 made payable to the U.S. Treasury for the taxes of the daughter of CLIENT-3 mailed to the Internal Revenue Service |
| 6 | 01/24/2023 | Check of $22,287.14 made payable to the U.S. Treasury for the taxes of the daughter of CLIENT-3 mailed to the Internal Revenue Service |
| 7 | 01/24/2023 | Check of $20,503.51 made payable to the U.S. Treasury for the taxes of the daughter of CLIENT-3 mailed to the Internal Revenue Service |
| 8 | 01/24/2023 | Check of $23,935.11 made payable to the U.S. Treasury for the taxes of the daughter of CLIENT-3 mailed to the Internal Revenue Service |
| 9 | 01/27/2023 | Check of $30,442.59 made payable to the U.S. Treasury for the taxes of the daughter of CLIENT-3 mailed to the Internal Revenue Service |
| 10 | 03/07/2023 | Check of $54,488.55 made payable to the U.S. Treasury for the taxes of CLIENT-3 mailed to the Internal Revenue Service |
| 11 | 03/07/2023 | Check of $49,046.90 made payable to the U.S. Treasury for the taxes of CLIENT-3 mailed to the Internal Revenue Service |
| 12 | 03/08/2023 | Check of $65,520.18 made payable to the U.S. Treasury for the taxes of CLIENT-3 mailed to the Internal Revenue Service |
| 13 | 03/09/2023 | Check of $66,072.53 made payable to the U.S. Treasury for the taxes of CLIENT-3 mailed to the Internal Revenue Service |

| | | |
|---|---|---|
| **14** | 03/10/2023 | Check of $66,359.48 made payable to the U.S. Treasury for the taxes of CLIENT-3 mailed to the Internal Revenue Service |
| **15** | 03/16/2023 | Check of $60,276.55 made payable to the U.S. Treasury for the taxes of CLIENT-3 mailed to the Internal Revenue Service |
| **16** | 03/29/2023 | Check of $77,652.86 made payable to the U.S. Treasury for the taxes of CLIENT-3 mailed to the Internal Revenue Service |

Id. at pp. 14–15, ¶ 57.

### B. Government's Trial Exhibits

Government's Exhibit No. 31 is a copy of a 2010 federal income tax return for CLIENT-3 and his wife, prepared by the defendant, with copy of check written on the defendant's law firm operating account. The check in this exhibit, which has nothing in its memo line, is the check referenced in Count 16 above (the "Count 16 Tax Payment"). As evidenced by certifications of lack of record marked as Government's Exhibits Nos. 69 and 70, the Internal Revenue Service ("IRS") has no record of receiving the tax return in this exhibit.

A certified copy of an IRS account transcript for CLIENT-3 and his wife for tax year 2010, marked as Government's Exhibit No. 77, does not reflect receipt or application of the Count 16 Tax Payment. In fact, the transcript does not reflect any activity on the account since 2012. The government anticipates that Edward Gompers will testify at trial that he prepared and filed a 2010 federal income tax return for CLIENT-3 and his wife in 2012. In addition, certified copies of IRS account transcripts for CLIENT-3 and his wife for tax years 2011 through 2019, and for CLIENT-3 alone (following the death of his wife) for 2023 and 2023, marked as Government Exhibits Nos. 78-88, do not reflect receipt or application of the Count 16 Tax Payment.

4

### C. Giglio Disclosure Regarding Application of the Count 16 Tax Payment

On October 17, 2025, the undersigned noticed that the Count 16 Tax Payment was not reflected in any of the account transcripts of CLIENT-3 and his wife, even though the check was debited from the defendant's bank account on or about March 29, 2023.  See Government's Exhibit No. 198.  Upon noticing this, the undersigned requested that IRS Court Witness Coordinator Salvatore Hazel determine on what account the Count 16 Tax Payment had been applied.  At the end of the day, on October 17, 2025, the undersigned received information that Mr. Hazel discovered that the subject payment had first been applied to an account belonging to a "Paul D. Harris" and then ultimately applied to the defendant's 2021 1040 account.  The undersigned then discovered that a copy of the defendant's 2021 account transcript, which reflected application of the Count 16 Tax Payment, was among records that the IRS Disclosure Office produced to the U.S. Attorney's Office under letter dated July 17, 2025, in response to an ex parte Order signed by this Court on May 14, 2025.  See Attachment No. 1 (SEALED), July 17, 2025, Production Letter with Defendant's 2021 1040 Account Transcript.  This account transcript reflects that the IRS received the Count 16 Tax Payment on March 27, 2023.  Id. at 5.

From July 17, 2025, until October 17, 2025, no one from the prosecution team (using that term to include the prosecutors and the investigators) had noticed that the defendant's 2021 account transcript in the July 17, 2025, production reflected application of the Count 16 Tax Payment.  The U.S. Attorney's Office had received a production from the IRS Disclosure Office under letter dated October 26, 2023, in response to an ex parte Order signed by this Court on June 27, 2023, that included an earlier version of this transcript that did not reflect the Count 16 Tax Payment.  See Attachment No. 2 (SEALED), October 26, 2023, Production Letter with

5

Defendant's 2021 1040 Account Transcript.  On October 17, 2025, the government marked the July 17, 2025, version of the defendant's 2021 account transcript as Government's Exhibit No. 279, its final exhibit until recent supplements.  See Doc. 61 at 27; Docs 70 & 84.

On October 20, 2025, the undersigned sent a letter to the defendant to direct his attention to Government's Exhibit No. 279, which had been disclosed to him with the other trial exhibits on the same date [Doc. 85-1].  In the letter, the undersigned informed the defendant that the Count 16 Tax Payment had been applied first to an account of a "Paul D. Harris" and then to his 2021 account.  Id.  The undersigned noted that this letter was "a good faith effort to comply with the government's Giglio obligation."  Id.  In this regard, the undersigned stated, "While the government intends to have Mr. Hazel testify as much during his direct examination, I wanted to make you aware of this for purpose of your cross-examination of Mr. Hazel."

Because the IRS applied the Count 16 Tax Payment to the defendant's account, the defendant has moved to dismiss the indictment [Doc. 85].

## II.   APPLICABLE LAW

Dismissal of an indictment may be warranted when egregious government conduct was "so outrageous as to shock the conscience of the court." United States v. Dyess, 478 F.3d 224, 234 (4th Cir. 2007) (internal citations omitted); see also United States v. Hasan, 718 F.3d 338, 343 (4th Cir. 2013) (holding that the "'outrageous conduct' doctrine survives in theory, but is highly circumscribed").  For government conduct to offend due process, the conduct must be "shocking" or "offensive to traditional notions of fundamental fairness." Hasan, 718 F.3d at 343 (citing United States v. Osborne, 935 F.2d 32, 37 (4th Cir. 1991)).  In addition, "[a] district court may not "exercise its discretion to dismiss an indictment with prejudice . . . under its supervisory power,

6

unless [a] violation caused prejudice to the defendant or posed a substantial threat thereof." United States v. Goodson, 204 F.3d 508, 514 (4th Cir. 2000).

### III. ARGUMENT

**IV. The defendant's motion should be denied because the government did not engage in any misconduct, nor did it commit a violation of law or a constitutional right that caused prejudice to the defendant or posed a substantial threat thereof.**

The Court may dismiss an indictment under its supervisory power if the government engaged in conduct that is so outrageous as to shock the conscience of the court and the conduct caused prejudice to the defendant or posed a substantial threat thereof. Dyess, 478 F.3d at 234; Goodson, 204 F.3d at 514. Conduct which courts have found did not warrant dismissal have included repeated actual misconduct by the government, including repeated discovery violations. United States v. Davis, 2019 WL 5865935 (W.D. Va. Nov. 8, 2019). The defendant has similarly not met this extremely high burden to warrant such a drastic and severe sanction.

Here, as discussed more fully above and below, civil IRS employees misapplied a payment to the defendant's account without the knowledge, and certainly without the complicity or coordination of the government. The government did not use the misapplication in grand jury proceedings because it was unaware of the misapplication until well after those proceedings. Once aware, the government promptly disclosed the misapplication to the defendant, pursuant to Giglio, so that the defendant could use the facts surrounding the misapplication to impeach the credibility of the government's witness who will testify about the accuracy of several relevant account transcripts. The government has no intention of casting aspersions as to whether the defendant was involved in the misapplication. In fact, the government intends to have this government witness testify on direct examination that there is no evidence the defendant was

7

involved in the misapplication, and that this misapplication has all the markings of an error by the IRS.

In this regard, there is no government misconduct to assess at all, let alone government conduct that is "shocking" or "offensive to traditional notions of fundamental fairness" or caused any prejudice to the defendant. Hasan, 718 F.3d at 343 (citing Osborne, 935 F.2d at 37); Goodson, 204 F.3d at 514. Accordingly, the defendant's motion should be denied.

**A. The defendant's motion should be denied because it is not supported by the facts.**

The defendant claims a "good-faith belief" that the government was "aware of or directly complicit in the improper reassignment of this payment before the grand jury proceedings," suggesting that "[t]he timing—occurring just months prior to the first indictment and during active Government review of the underlying tax transactions—strongly supports this conclusion." ([Doc. 85-2] at 2). Elsewhere, he similarly speculates that the payment was "intentionally reassigned" to his account "at a time when prosecutors were preparing the first indictment." Id. at 3.

But the government had nothing to do with the assignment of this payment, and there is nothing to suggest otherwise. The defendant mailed this check to the IRS submission processing center in Ogden, Utah. See Government's Exhibits Nos. 63–68 (showing various tax returns stamped received in Ogden, Utah and including a copy of the envelopes with the location in Ogden, Utah as the intended destination address). The undersigned is informed that the payment was initially misapplied upon receipt to an account of "Paul. D. Harris" in March 2023, presumably by a civil IRS employee in Ogden, Utah, and then further misapplied to the defendant's account by a civil IRS employee in Kansas City, Missouri, in January 2025.

8

As stated above, the government first became aware of this history of misapplication on October 17, 2025, which is also when the government marked the account transcript as its final exhibit, until recent supplements, and out of order from all the other account transcripts. Thus, the government was not aware at the time of the first indictment (5:25-CR-28) on June 3, 2025, or the instant indictment on September 16, 2025. Moreover, as indicated above, the government did not even possess the account transcript until after it received the July 17, 2025, production from the IRS Disclosure Office. See Attachment No. 1 (SEALED).

One clue that the application of the payment to the defendant's account was a mistake, rather than a grand conspiracy involving random civil IRS employees in Utah and Missouri, is the fact that the payment was first applied to the account of a "Paul D. Harris." Another sign of error, rather than collusion, is the fact that it was the government who brought it to the defendant's attention and suggested that it could <u>help</u> his case as material for the cross-examination of Mr. Hazel, who will be testifying regarding the other account transcripts.

**B. The defendant's motion should be denied because misapplication of the payment to the defendant's account has no legal effect on Count 16.**

The defendant asserts that the government "leveraged" the "misapplied payment to falsely allege criminal conduct in Count 16." ([Doc. 85-2] at 3). The government did not "leverage" this information with the grand jury because the government was not aware that the payment was misapplied to the defendant's account until after both indictments were obtained, and thus, neither case agent mentioned that the payment was misapplied to the defendant's account while testifying to present either indictment. See Attachment No. 3 (SEALED), FBI Special Agent Michael Torbic Grand Jury Transcript, June 3, 2025; Attachment No. 4 (SEALED), IRS-CI Special Agent Dakota Kelly Grand Jury Transcript, June 3, 2025; Attachment No. 5 (SEALED), FBI Special

9

Agent Michael Torbic Grand Jury Transcript, September 16, 2025; Attachment No. 6 (SEALED), IRS-CI Special Agent Dakota Kelly Grand Jury Transcript, September 16, 2025.

The defendant claims that Count 16 "falsely alleg[es] that the payment was made 'for the taxes of CLIENT-3' as part of a fraudulent scheme." The defendant does not include a citation for his quotation. But the only place in the indictment that uses the phrase "for the taxes of CLIENT-3" is the chart of the mail fraud counts in descriptions of the mailings. ([Doc. 1] at pp. 14–15, ¶ 57). In the chart, Count 16 describes the mailing as, "Check of $77,652.86 made payable to the U.S. Treasury for the taxes of CLIENT-3 mailed to the Internal Revenue Service." Id. at p. 15, ¶ 57) (emphasis added). That this payment was misapplied to the defendant's account does not mean the payment was not "for the taxes of CLIENT-3," i.e., intended for the taxes of CLIENT-3. After all, the defendant himself states in his memorandum in support of his motion, "As with other payments, this check was mailed to the IRS accompanied by a Form 1040-V voucher[1] containing only CLIENT-3's identifying information . . . ." ([Doc. 85-2] at 2).

The indictment alleges, and the evidence will show, that this mailing was for the purpose of executing the defendant's scheme to defraud his clients because, at the time of the mailing, 1) the defendant had converted to his own use the money that CLIENT-3 had given him to pay the taxes; 2) the defendant had attempted to lull the son of CLIENT-3 by fraudulently representing that he had sent checks, including this one, to the IRS in 2022; and 3) the defendant was

---

[1] The government has no corroboration that the defendant submitted the payment with a Form 1040-V voucher. The defendant marked as trial exhibits copies of the payment checks, see Defendant's Exhibit No. 16, but none of his exhibits include copies of the Form 1040-V vouchers. Because the defendant did not file the underlying tax return, see Government's Exhibits Nos. 69 and 70, and he left the memo line of the check blank, see Government's Exhibit No. 31, if he also did not send in the Form 1040-V voucher, then this could explain how the check was applied to his account, given that his name is on the check.

10

misappropriating funds from the settlement of the class action involving CLIENT-4 to fund the checks, including this one, that he was now, in 2023, sending to the IRS. United States v. Snowden, 770 F.2d 393, 398 (4th Cir. 1985) (citing United States v. Sampson, 471 U.S. 75 (1962) and United States v. Maze, 414 U.S. 403 (1974)); see also United States v. Godwin, 272 F.3d 659, 668 (4th Cir. 2001); United States v. Pierce, 409 F.3d 228, 232-33 (4th Cir. 2005) (both citing favorably Snowden, 770 F.2d at 398).

Therefore, for purposes of pleading and proving Count 16, it makes no difference if the payment was ultimately applied to the account of CLIENT-3, Paul J. Harris, or even Paul D. Harris. The indictment alleges, and the evidence will show, that the defendant used the mails for the purpose of executing his scheme to conceal his prior misuse of the client funds of CLIENT-3.

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's Motion to Dismiss Indictment for Outrageous Government Conduct.

    Respectfully submitted,

    MATTHEW L. HARVEY
    UNITED STATES ATTORNEY

By:   /s/ Jarod J. Douglas
    Jarod J. Douglas
    Assistant U. S. Attorney

    and

    /s/ Jennifer T. Conklin
    Jennifer T. Conklin
    Assistant U. S. Attorney

**CERTIFICATE OF SERVICE**

I, Jarod J. Douglas, Assistant United States Attorney for the Northern District of West Virginia, hereby certify that on the 23rd day of October 2025, the foregoing UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT was electronically filed with the Clerk of the Court using the CM/ECF system and was served on the defendant via email, at the defendant's request, to harrislawofficeswhg@gmail.com, on the same date.

        MATTHEW L. HARVEY
        UNITED STATES ATTORNEY

By:   /s/Jarod J. Douglas
       Jarod J. Douglas
       Assistant U. S. Attorney