**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**UNITED STATES OF AMERICA,**

        Plaintiff,

v.

        **CRIM. ACT. NO. 5:25-CR-34**
        Judge Bailey

**PAUL J. HARRIS,**

        Defendant.

## ORDER

Pending before this Court is Defendant's Motion for Judgment of Acquittal, or in the Alternative, Motion for New Trial [Doc. 159], filed December 15, 2025.[1]  The Government filed a Response [Doc. 169] on January 15, 2026.[2]  This matter is ripe for adjudication. For the reasons contained herein, defendant's Motion [**Doc. 159**] is denied.

## I. BACKGROUND

On September 16, 2025, a grand jury returned a 29-count Indictment against the defendant. [Doc. 1].  The Indictment charged the defendant, an attorney, with mail and wire fraud arising from his allegedly fraudulent obtaining and mishandling of client funds,

---

[1]Defendant filed a separate Motion for New Trial [Doc. 170] on January 19, 2026.

[2]Per this Court's November 14, 2025 Judgment Order [Doc. 142], responses to post-trial motions were due "**within thirty (30) days of the filing date of any such motions[.]**"  [Doc. 142 at 4] (emphasis in original).  Defendant's Motion was filed December 15, 2025.  Thirty (30) days from December 15, 2025, is January 14, 2026. As such, the Government's Response is untimely.  However, this Court will still consider the Government's Response on its merits.

including his commingling of client funds with non-client funds in his law firm operating account and his conversion of client funds to his own use. *See generally* [Id.]. The Indictment also charged the defendant with engaging in unlawful monetary transactions with proceeds of wire fraud. [Id.].

From November 3, 2025, through November 13, 2025, this Court presided over a trial on the Indictment.

On November 9, 2025, after the close of the Government's case-in-chief, defendant filed a motion for judgment of acquittal on all counts. [Doc. 126]. On November 10, 2025, after hearing argument from the parties and finding sufficient evidence on each count, viewing the evidence in the light most favorable to the Government, the Court orally denied the motion. [Doc. 128].

On November 11, 2025, after the close of his case, defendant filed a renewed motion for judgment of acquittal on all counts. [Doc. 130].

On November 12, 2025, the Court entered an order denying defendant's renewed motion, stating defendant was relying upon the same arguments presented in the original motion for judgment of acquittal. [Doc. 132].

On November 13, 2025, the jury returned a verdict of guilty on all counts. [Doc. 137]. This Court then adjudged defendant guilty on all counts. [Doc. 142 at 3].

On December 15, 2025, defendant filed the instant Motion. [Doc. 159].

2

## II. <u>LEGAL STANDARDS</u>

### A.    <u>Judgment of Acquittal</u>

Federal Rule of Criminal Procedure 29(c) allows a defendant to renew a motion for judgment of acquittal after a guilty verdict.  The trial court should deny the renewed motion if, "viewing the evidence in the light most favorable to the [G]overnment, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." ***United States v. Tresvant***, 677 F.2d 1018, 1021 (4th Cir. 1982) (internal citation omitted).  In its review, the trial court should not consider "the credibility of witnesses, but must assume that the jury resolved all contradictions ... in favor of the Government." ***United States v. Studifin***, 240 F.3d 415, 424 (4th Cir. 2001) (internal citation and quotation marks omitted).

### B.    <u>New Trial</u>

Rule 33(a) of the Federal Rules of Criminal Procedure provides a district court may vacate a criminal conviction and "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[I]n deciding a motion for a new trial, the district court is not contained by the requirement that it view the evidence in the light most favorable to the [G]overnment and may evaluate the credibility of the witnesses." ***United States v. Miller***, 41 F.4th 302, 315 (4th Cir. 2022) (internal quotation marks omitted).  In so deciding, the district court may draw on its knowledge and observations of the trial as the presiding judge. *See **United States v. Johnson***, 487 F.2d 1278 (4th Cir. 1973) (per curiam) (district court did not err in drawing on its recollection, as the presiding trial judge, of the suspicious circumstances surrounding post-trial recantation of a trial witness's testimony).

3

A new trial is warranted only if such relief would prevent a miscarriage of justice. *See*, *e.g.*, ***United States v. Magallon***, 984 F.3d 1263, 1286 (8th Cir. 2021) (motions for new trial "should only be granted when a miscarriage of justice may have occurred.") (internal citation and quotation marks omitted); ***United States v. Gramins***, 939 F.3d 429, 444 (2d Cir. 2019); ***United States v. Laureano-Salgado***, 933 F.3d 20, 29 (1st Cir. 2019) ("the new-trial remedy must be used sparingly, and only where a miscarriage of justice would otherwise result.") (internal citation and quotation marks omitted); ***United States v. Chapman***, 851 F.3d 363, 380–81 (5th Cir. 2017); ***United States v. Arrington***, 757 F.2d 1484 (4th Cir. 1985) (new trial is warranted only "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment[.]") (internal citations omitted).

The defendant bears the weighty burden of establishing that relief under Rule 33 is warranted. *See* ***United States ex rel. Darcy v. Handy***, 351 U.S. 454 (1956).

### III. <u>DISCUSSION</u>

#### A.    <u>Judgment of Acquittal</u>

Defendant raises two (2) theories which he argues entitle him to a judgment of acquittal on the fraud and unlawful monetary transaction charges of which the jury found him guilty. First, defendant argues, as he has at every stage of the proceedings, that mail fraud and wire fraud can be based only on fraudulent inducement, i.e., to use material misrepresentations to obtain money in the hands of the victims. [Doc. 160 at 18–32]. Second, defendant argues the mailings and wires are not in furtherance of the charged

scheme.[3] [Id. at 32–39]. Each theory, which will be addressed in turn, fails to warrant such a remedy.

### 1. There was sufficient evidence, viewed in the light most favorable to the Government, that defendant devised or intended to devise a scheme for obtaining money by means of materially false or fraudulent representations.

Defendant argues all the fraud counts, and thus the unlawful monetary transaction counts, fail because there was no evidence that he made material misrepresentations to obtain money in the hands of the victims. For the evidentiary and legal reasons articulated below, this Court rejects this argument.

### a. There was sufficient evidence of material misrepresentations to obtain money in the hands of the victims.

#### i. Greg Fluharty

While there were no counts for the jury to consider regarding Greg Fluharty, there was compelling and undeniable evidence of material misrepresentations that defendant made to him to obtain his money which, as this Court ruled pretrial, the jury could consider

---

[3]In addition, defendant challenges the Court's instructions regarding the fraud elements because they used the disjunctive "or" between "a scheme to defraud" and "a scheme to obtain money." *See* [Doc. 160 at 21 (referring to Doc. 136 at 19 & 29)]. Defendant argues this improper instruction completed a constructive amendment of the Indictment because, he argues, the Government sought at trial to prove a breach of fiduciary duty scheme, not one involving misrepresentations. First, Rule 29 is not an appropriate vehicle for challenging jury instructions. *See United States v. Dawkins*, 999 F.3d 767, 780 n.12 (2d Cir. 2021); *United States v. Rivers*, 108 F.4th 973, 985 (7th Cir. 2024). Second, the jury instructions were proper because they tracked the statutes verbatim. *See* 18 U.S.C. §§ 1341, 1343. Third, as established in the Government's Response, the Government did not rely on a breach of a fiduciary duty. Rather, the Government produced sufficient evidence of material misrepresentations.

as evidence of the existence of the overall scheme alleged in the Indictment. [Doc. 87 at 14].

Mr. Fluharty testified that he transferred hundreds of thousands of dollars he had inherited from his mother to the defendant because defendant represented to him that (1) the money was vulnerable to a civil judgment arising out of Mr. Fluharty's son's recent vehicle accident that resulted in a fatality; (2) defendant would place the money in an irrevocable trust and hold it there; and (3) the money would be safe in the trust. [Doc. 152 at 219–22].

Evidence admitted at trial shows that all three (3) of defendant's representations, which according to Mr. Fluharty caused him to part with the money, were false.

First, Joseph Ferretti testified, as an expert on parental liability and negligent entrustment, that Mr. Fluharty's money was not vulnerable to civil judgment arising from his son's accident because the facts did not support a claim for parental liability of negligent entrustment.  [Doc. 165 at 80].

Second, defendant did not place the money in an irrevocable trust and hold it there; rather, he deposited the funds in his IOLTA account and then expended all the money, including to purchase his current residence.  [Id. at 218–31]; Government's Trial Exhibits Nos. 107, 109–110, 113, 233–234, 236–242, 244, 246–247, 257–258, & 265.

Third, Mr. Ferretti testified, as an expert on fraudulent transfers and the voiding of fraudulent transfers, that Mr. Fluharty's money would not be safe from a civil judgment if placed in a trust because a court could find the transfers to be fraudulent and void the transfers to make the money available for collection.  [Doc. 165 at 81].

Accordingly, viewed in the light most favorable to the Government, a rational jury could conclude that defendant's material misrepresentations to Mr. Fluharty, and the subsequent conversion of Mr. Fluharty's money to his own use, set in motion the executions of the fraudulent scheme as it pertains to Thomas Carr and Michelle Giovengo.

### ii. Thomas Carr (including Travis Carr as Power of Attorney)

There was sufficient evidence of defendant's material misrepresentations to obtain money from Thomas Carr and his power of attorney, Travis Carr. This Court will first discuss defendant's conviction on Count 17 of the Indictment.

Regarding the $300,000 wire transfer on November 30, 2020, Travis Carr testified that his understanding, after communicating with defendant and before he approved the transfer as power of attorney for his father, was the defendant "was going to use [the $300,000] to take care of Brittany's conservatorship reporting and whatever things that needed taken care of in that capacity." [Doc. 152 at 5–6, 11]. Travis Carr testified that, as power of attorney for his father, he did not authorize defendant to hold the money anywhere but in his client trust account, to use the money to pay his wife's credit card, or to fund any payments to Mr. Fluharty. [Id. at 12–13]. However, according to bank records admitted in evidence, defendant used the money to pay his wife's credit card bill and to fund a payment to Mr. Fluharty, both on December 11, 2020, and fully expended the money by January 25, 2021. *See* Government's Trial Exhibits Nos. 143, 144, 159, 163, 165, & 261.

Based on the near immediate misuse of the money, a rational trier of fact could infer defendant intended such misuse when he originally represented, falsely, that he would use the money for Brittany Carr's conservatorship reporting.

7

Further, in a May 2022 court filing, defendant stated: "Because of the contingency fee arrangement between Mr. Thomas Carr and Mr. Harris in a mine subsidence case, it was previously agreed that Mr. Harris would not charge fees related to the preparation of the conservatorship accounting reports . . . ." *See* Government's Trial Exhibit No. 17. The "contingency fee arrangement" was a reference to the first–party claim and third–party claim fee agreements executed by Travis Carr as power of attorney for Thomas Carr on December 14, 2020, and January 28, 2021. *See* Government's Trial Exhibits Nos. 3 & 4.

Certainly, a reasonable jury could rely on this evidence of defendant's subsequent inconsistent statement to conclude that his earlier statement made to obtain the money, i.e., that the money would be used to fund his work on Brittany Carr's conservatorship reports, was false and fraudulent, and to reject the defense that the money was a retainer and he had earned the money before using it for personal expenditures.

Accordingly, viewing the evidence in the light most favorable to the Government, there is sufficient evidence of material misrepresentation to sustain the wire fraud conviction on Count 17 of the Indictment (the $300,000 wire).

This Court will now discuss defendant's conviction on Count 2 of the Indictment.

Regarding the $200,000 check from Nationwide, dated March 19, 2021, the trial record includes a written fee agreement, dated January 28, 2021, between defendant and Travis Carr, as power of attorney for Thomas Carr. *See* Government's Trial Exhibit No. 4. In the fee agreement, defendant represented he would handle the insurance claim and take a fee of 40% plus expenses. Id. By signing the agreement, Travis Carr agreed to these terms as a precondition for the defendant receiving and handling the insurance proceeds. Id. As far as expenses, defendant's own accounting records do not include any

8

expenses related to this representation. *See* Defense Exhibit No. 9 at 26–28. As a practical matter, therefore, a rational trier of fact could interpret defendant's representation to Travis Carr as, "If you sign this fee agreement, agreeing that I will obtain and handle your insurance proceeds, I will only keep 40% of the proceeds as my fee." Yet, according to certified bank records in evidence, that is not what happened.

In fact, Travis Carr testified that, based on conversations with defendant, he believed the insurance proceeds check would be deposited in defendant's client trust account "just like everything else is supposed to be." [Doc. 152 at 21]. He also testified that, as power of attorney for his father, he never authorized defendant to hold the funds anywhere but in his client trust account and, specifically, he never authorized defendant to use the money to fund any payments to Mr. Fluharty. [Id. at 21–22].

But that is exactly what defendant did. As part of expending the funds in full by April 19, 2021, which defendant deposited only with the co-signature of Thomas Carr, he used the money to fund a check of $50,000 to Mr. Fluharty, written within a few days of depositing the Nationwide check. *See* Government's Trial Exhibits Nos. 166, 169, & 275.

Moreover, admitted evidence showing that defendant later claimed falsely in (1) a May 2022 court filing, (2) an August 2023 administrative proceeding filing, and (3) during his February 2024 administrative hearing testimony that Thomas Carr's portion of the Nationwide insurance proceeds were used to pay the family's outstanding tax liabilities only serves to emphasize the false and fraudulent nature of defendant's initial misrepresentation made to obtain the money. *See* Government's Trial Exhibits Nos. 17, 268, & 269.

9

Accordingly, viewing the evidence in the light most favorable to the Government, there is sufficient evidence of material misrepresentation to sustain the mail fraud conviction on Count 2 of the Indictment (the $200,000 Nationwide check).

This Court will now discuss defendant's conviction on Count 19 of the Indictment.

Regarding the wire transfer of $611,581.04 on April 14, 2021, Travis Carr testified that, at some point, he became aware that defendant had received these funds from the family when he talked to Mark Gellerman, the person handling the sale of the family's property that generated the funds. [Doc. 152 at 23]. Travis Carr testified that he then spoke to defendant, who told Travis Carr that the funds would be used to pay the Carr family's delinquent income taxes, for no additional fee, and that any remaining funds would be returned to the family. [Id. at 23–24]. From this evidence the jury could reasonably conclude that defendant or his agent made a similar representation to Mark Gellerman and/or Thomas Carr himself to cause the funds to be wired to him, or at least a representation that the money would be used to the Carr family's benefit.

Travis Carr testified that, as power of attorney for his father, he did not authorize the defendant to: (1) keep these funds anywhere except for his client trust account, (2) to use the money to trade in a TD Ameritrade account of the defendant, or (3) to use the money to purchase cryptocurrency for the defendant, nor to his knowledge had his father given such authorization. [Doc. 25 at 24–25].

But, again, this is exactly what defendant did, and with haste. As part of expending the funds in full by June 15, 2021, he used the money to trade in his TD Ameritrade account (opened a couple weeks before the wire) and to purchase cryptocurrency in his Coinbase account (opened a few days after the wire). *See* Government's Trial Exhibits

10

Nos. 145–146, 148, 170–171, 184, 188, & 263.  He also used the money to pay off his law firm loan and to fund checks to John Woodring and The Linsly School.  *See* Government's Trial Exhibits Nos. 174 & 176–178. He also used the money to fund most of a $100,000 check to Mr. Fluharty.  *See* Government Trial Exhibit No. 172.

And, viewing the evidence in the light most favorable to the Government, he had not earned this money pursuant to a November 22, 2020 fee agreement concerning a retainer in an unspecified amount for "various family matters," purportedly signed by his father. There was more than sufficient evidence in the record for the jury to reject this defense. The Carrs' attorney, Burton Hunter, testified that he first received this retainer agreement in February 2024, from a member of the body handling defendant's administrative proceedings. It was not in the file he received from defendant.

As a more practical matter, the most likely candidate for the subject retainer, i.e., the $300,000 received ten (10) days after the purported execution of the letter, was already spent in full by January 2021. *See* Government's Trial Exhibits Nos. 165 & 261. Further, defendant stated in a May 2022 court filing that he did not charge a fee for his work on the delinquent taxes, so the purported retainer agreement could not have been referring to the $611,581.04 wire as a retainer.  *See* Government's Trial Exhibit No. 17.

Finally, it makes no logical sense that either the $300,000, received in November 2020, or the $611,581.04, received in April 2021, could be a retainer for the potential criminal tax defense of the Carr family since the defendant stated himself, in writing to Thomas and Travis Carr in June 2021 that, "[i]n early **May 2021, all of us discovered, for the first time**, that the tax returns for the conservatorship and for Tom and Jackie

11

individually, have not been filed since 2011." *See* Government Trial Exhibit No. 7 (emphasis added).

Accordingly, viewing the evidence in the light most favorable to the Government, there is sufficient evidence of material misrepresentation to sustain the wire fraud conviction in Count 19 (the $611,581.04 wire).

### iii.  **Michelle Giovengo**

This Court will now discuss defendant's conviction on Count 3 of the Indictment.

Regarding the $1 million settlement check from Covestro for the estate of Joseph Giovengo, dated November 23, 2022, the trial record includes a written fee agreement, executed February 18, 2021, between the defendant and Michelle and Joseph Giovengo. *See* Government Trial Exhibit No. 93.  In the fee agreement, defendant represented that he would handle the Giovengos' claim and take a fee of 40% plus "all reasonable and necessary" expenses. Id. at 1. In addition, the agreement contains defendant's representation that he would "withhold and/or pay from any recovery other obligations legally owed by [the Giovengos]," including the resolution of subrogation liens. Id. at 2. By signing the agreement, the Giovengos agreed to these terms as a precondition for the defendant receiving and handling any settlement proceeds.  Id. at 3.

As a practical matter, therefore, a rational trier of fact could interpret defendant's representations to the Giovengos as, "If you sign this fee agreement, agreeing that I will obtain and handle your settlement proceeds, I will only keep 40% of the proceeds as my fee plus all reasonable and necessary expenses, and I will hold onto whatever funds are needed to resolve subrogation."

In addition, Michelle Giovengo testified she co-signed the back of the settlement check so it could be deposited. [Doc. 152 at 118]. Ms. Giovengo testified that she learned from defendant that she had to come to defendant's law office to endorse the check. Id. Ms. Giovengo testified that when she came to defendant's office, defendant told her that "there possibly could be a lien put on this money." Id. Ms. Giovengo testified that she understood from her conversation with defendant at that time that he was going to deposit the check in his client trust account. Id. at 119. Based on such representations from defendant, she signed the back of the check. Id. From this testimony, a rational trier of fact could conclude Ms. Giovengo only effectuated the release of the settlement funds to defendant's custody because he represented that he would keep the funds in his client trust account until they could be given to Ms. Giovengo and her family.

But, as the trial record shows, defendant handled the Giovengos' settlement proceeds in direct contravention of his representations, including his attempts to withhold more money for expenses than he had incurred and his expenditure of the money prior to resolution of subrogation.

Regarding the expenses, Ms. Giovengo testified defendant gave her a list and supporting documentation in a meeting that she audio and video recorded, and a copy of which documents were admitted in evidence as Government's Exhibit No. 100. [Doc. 152 at 152–166]. The trial record establishes that the expense document included false and fraudulent expenses, in direct contravention of defendant's representation in their fee agreement that he would withhold only "reasonable and necessary" expenses, including:

13

• First, the expense document listed an expense of $26,000 for Angelo Georges, *see* Government's Trial Exhibit No. 100, whereas Dr. Georges testified that he received only $4,950, i.e., a difference of $21,050.

• Second, the expense document listed an expense of $10,500 for James Cartwright, whereas Mr. Cartwright testified that he received only $5,000 after the settlement, i.e., a difference of $5,500. *See* Government Trial Exhibits Nos. 100 & 214.

• Third, the expense document included facially duplicative amounts for Gossman Forensics, James Start, M.D., and Nachman Brautbat, M.D, resulting in a difference of $24,687.50. *See* Government's Trial Exhibit No. 100.

• Fourth, the expense document included an expense of $26,400 for Investigation Division, run by Franklin Streets, even though Mr. Streets was unable to recognize the Covestro case during his trial testimony. *See id.*

• Fifth, the expense document included expenses totaling $220,400 for Dr. Allen Saoud/AGS Medical Consultants, even though:

> 1. Dr. Saoud was on home confinement as part of a sentence for federal healthcare fraud when he allegedly began working for defendant regarding the Covestro case. *See* Government's Trial Exhibits Nos. 100 & 276;
>
> 2. According to the expense document that defendant first provided to Ms. Giovengo, Dr. Saoud had allegedly completed $25,000 of work on the Covestro case prior to informing his U.S. probation officer of a working relationship with defendant. *See* Government's Trial Exhibits Nos. 100 & 278;

14

3. Dr. Saoud's invoices, attached to the expense document defendant first provided to Ms. Giovengo, are fraudulently redacted to make it appear that Dr. Saoud was working on other cases for defendant. *See* Government's Trial Exhibit No. 100; and

4. When Michelle Giovengo challenged Dr. Saoud's expenses, defendant abandoned all of Dr. Saoud's expenses. *See* Government's Trial Exhibit No. 104.

Regarding subrogation, bank records admitted at trial show defendant did not hold onto settlement funds needed to resolve subrogation for the Giovengos. By mid–October 2023, defendant no longer had any Covestro settlement funds for any plaintiff. *See* Government Trial Exhibits Nos. 212–213, & 264.

Bank records also show that, when defendant had to deposit over $300,000 of the Giovengos' proceeds in with the general receiver, the check was not funded by their proceeds. $6,500 of the check was funded by a transfer from defendant's Charles Schwab f/k/a TD Ameritrade account. *See* Government Trial Exhibits Nos. 220–221, & 272. A few more thousand was funded by the Square account of Harris Law Office, including from running defendant's wife's credit card. *See* Government Trial Exhibits Nos. 220, 274, & 280.

Finally, when defendant paid the Giovengos' subrogation claim, the cashier's check was not funded with their settlement proceeds, in direct contravention of his representation in their fee agreement. Rather, the $50,000 used to purchase the cashier's check came from defendant's son–in–law. *See* Government Trial Exhibits Nos. 270-271.

15

Accordingly, viewing the evidence in the light most favorable to the Government, there is sufficient evidence of material misrepresentation to sustain the mail fraud conviction in Count 3 (the Giovengos' $1 million Covestro check).

### iv.    **Rocky Tingler**

Regarding the $50,000 retainer he paid the defendant to represent him in a criminal tax matter, Rocky Tingler testified defendant told him it would cost $50,000 "up front" to represent Mr. Tingler. [Doc. 152 at 247]. Mr. Tingler testified that he understood $50,000 was "just the starting point" because defendant represented that "$10,000 would go to a forensic accountant" and "private investigators." [Id.]. Mr. Tingler testified that when he first sent defendant only $25,000, defendant "made it clear that he was not going to do the case unless he had the whole $50,000." [Id. at 248]. Mr. Tingler testified that, based on his conversations with defendant, it was his understanding that once he paid the $50,000, then defendant would use the money to start working on his case, and he could have to eventually pay the defendant more money to continue the representation. [Id. at 248–249]. According to Mr. Tingler, there was no fee agreement; rather, these were defendant's oral representations. [Id. at 249–250]. From this testimony, a reasonable trier of fact could conclude  Mr. Tingler gave defendant $50,000 based on defendant's representation that he would draw down on the money as he earned the fee and incurred expenses of working on the case. However, in the light most favorable to the Government, that is not what the bank records show happened.

By the end of December 2017, meaning within a matter of a few weeks of receiving the $50,000, defendant had fully expended the money, and did so in a manner inconsistent

with the representations made to obtain the money from Mr. Tingler.  *See* Government's Trial Exhibits Nos. 251, 253, 255–256, 266–267.

In any event, the Indictment did not charge, and thus there are no convictions for, mail or wire fraud related to the initial obtaining of the money from Mr. Tingler. Nevertheless, like the evidence of how defendant fraudulently obtained the money from Mr. Fluharty, the jury could have reasonably relied on this evidence regarding Mr. Tingler to inform how they considered the counts related to the obtaining of money from Thomas Carr and Michelle Giovengo.

This Court will return to the case of Mr. Tingler when addressing the lulling counts below.

> **b.** **Even assuming an initial fraudulent inducement is required, because the evidence establishes that the defendant made misrepresentations about his future use of the funds to get the clients to part with the money, as outlined above, the mail and wire fraud convictions involving the defendant's subsequent misappropriation of the money must be sustained.**

Throughout this case, defendant has maintained mail fraud and wire fraud must involve a fraudulent inducement in the initial obtaining of the money. Even accepting this as true, the Government has established above that there is sufficient evidence of such fraudulent inducement, and thus, counts based on the mailings and wires involved in defendant's subsequent misappropriations must be sustained as executions of the scheme involving fraudulent inducement, especially in a case involving an attorney holding the induced funds in trust. "Funds in an IOLTA account are the property of the client and not the lawyer." ***United States v. Detling***, 2019 WL 3006623, at *2 n.3 (N.D. Ga. Apr. 30, 2019).  Fraud charges rooted in misuse of an IOLTA account are indeed viable.

17

See generally *id.*; *see also* **United States v. Keller**, 395 Fed.App'x. 912 (3d Cir. 2010) (unpublished).

In **United States v. Keller**, the defendant, a lawyer, undertook to represent a client in connection with the sale of the client's mother's house.  395 Fed.App'x. at 913. The lawyer placed $300,000 of the proceeds from the sale of the home into his IOLTA account.  *Id*.  The lawyer proceeded to write "dozens of checks from the IOLTA account and deposited them in his firm's account," and used the money "to pay his own expenses and those of his law firm."  *Id.* at 913–14.  The lawyer was indicted on seventeen (17) counts of wire fraud, and was found guilty at trial on twelve (12) of the counts.  *Id*. at 914. The United States Court of Appeals for the Third Circuit upheld his conviction on appeal, in part due to the wirings being an essential part of the scheme, or a step in the plot.  *Id*. at 915.  The factual basis of **Keller** is similar to the underlying facts of defendant's case herein, i.e., the mishandling of a lawyer's clients' money.

For example, the mail fraud convictions on Counts 4 through 16 are based on the mailing of checks to the Internal Revenue Service ("IRS") as payments of the Carr family's delinquent income taxes, which admitted bank records show were funded (or, in the case of Count 16, were attempted to be funded) by Covestro settlement proceeds, including proceeds belonging to the estate of Ms. Giovengo's husband. *See* Government's Exhibits Nos. 198, 200–201, 203, 205, 207, & 264; *see also* [Doc. 165 at 196–199 (Testimony of FBI SA M. Torbic)].  As outlined above, the trial record shows defendant induced Ms. Giovengo to part with this money, in part, by representing that he would hold onto the money for resolving the subrogation claim.  And some of this money was fraudulently

retained based on false expenses, in contradiction of their fee agreement, as shown above.

Likewise, the wire fraud convictions on Counts 18, 20, and 21 are based on interstate wires involved in transfers to JP Morgan Chase as a payment on defendant's wife's credit card to TD Ameritrade to trade in the defendant's account, and to Coinbase to purchase cryptocurrency from defendant's account. *See* Government's Trial Exhibits Nos. 143–146, 148, 171, & 184. Bank records admitted at trial show these transfers were fraudulently funded by Thomas Carr client funds. *See* Government's Trial Exhibits Nos. 159–162, 170–171, 184, 261, & 263. As explained above, the trial record shows defendant induced Thomas and Travis Carr to part with this money by representing that he would use the money to their family's benefit, including for preparation of the conservator reports and the payment of delinquent income taxes.

Accordingly, viewing the evidence in the light most favorable to the Government, there is sufficient evidence of material misrepresentations to sustain the mail and wire fraud convictions in Counts 4 through 16 (Carr IRS checks), 18 (JPMC), 20 (TD Ameritrade), and 21 (Coinbase).

19

**c.** **Even assuming an initial fraudulent inducement is required, because the evidence establishes defendant made misrepresentations about his future use of the funds to get the clients to part with the money, as outlined above, then the mail and wire fraud convictions involving defendant's subsequent actions to conceal his misuse of the money and lull the clients must be sustained.**

Similarly, accepting as true that mail fraud and wire fraud must involve fraudulent inducement, the Government has established above that there is sufficient evidence of such fraudulent inducement, and thus, counts based on the mailings and wires involved in defendant's concealment of his misappropriation and his attempts to lull must be sustained as executions of the scheme involving fraudulent inducement, especially in a case involving an attorney holding the induced funds in trust.

For example, the mail fraud convictions on Counts 4 through 16 of the Indictment, based on the mailing of the IRS check payments for the Carrs, involved not only the defendant's misappropriation of Covestro client funds, but also they involved the defendant's attempt to conceal his prior misappropriation of the Carr client funds intended to fund the tax payments and to lull the Carrs, especially Travis Carr, who had been pressuring defendant about the tax payments and threatening legal action. *See* Government Trial Exhibits Nos. 145–146, 148, 171, 174, 176–178, 184, 188, & 263 (misappropriation of funds intended for tax payments); 8–14, 18, & 52 (pressure from Travis Carr). These attempts to conceal misappropriation of the funds and to lull the Carrs about the use of the funds are directly tied to the initial fraudulent inducement of the funds.

The same applies to the wire fraud convictions on Counts 22 through 24 based on emails defendant sent to Travis Carr.

Count 22 of the Indictment is based on an email that defendant sent to Travis Carr on June 16, 2021, which was approximately two (2) months after defendant received the funds to be used to pay the family's delinquent income taxes, and which was one (1) day after defendant had fully expended the money without paying any of the intended tax debt. *See* Government's Trial Exhibits Nos. 7, 170, 188, & 263. In the letter attached to the email, defendant stated, "we anticipate the returns will be filed in the next few weeks." *See* Government's Trial Exhibit No. 7.

As an initial matter, defendant's statement that he anticipated filing the tax returns "in the next few weeks" was false and fraudulent because defendant no longer had the funds to pay the taxes and, in fact, he ultimately did not file the tax returns until starting in January 2023, approximately 19 months later and only after he had the funds from the Covestro settlement.   *See* Government's Trial Exhibits Nos. 71–88, 188, 198–199, 263–264, & 279.

Moreover, viewing the evidence in the light most favorable to the Government, defendant sent this email to conceal his misappropriation of the funds intended for the tax debt and to lull Travis Carr by making him believe that the tax returns were then being prepared and, implicitly, that the funds were still held in trust to pay the taxes associated with the returns. As such, this email is sufficiently related to the initial fraudulent inducement. *See **United States v. Colton***, 231 F.3d 890, 898 (4th Cir. 2002) ([Concealment] is characterized by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter. [Nondisclosure] is characterized by mere silence. Although silence as to a material fact

(nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with the intent to deceive (concealment) does.").[4]

Count 23 of the Indictment is based on an email defendant sent to Travis Carr on July 19, 2021, which was approximately three (3) months after defendant received the funds to be used to pay the family's delinquent income taxes, and which was approximately one (1) month after defendant had fully expended the money but not to pay any of the intended tax debt and only $1,000 toward Travis Carr's child support debt. *See* Government's Trial Exhibits Nos. 8, 170, 188–189, & 263. In the email, defendant answered in the affirmative to Travis Carr's question, "Are you not handling the child support issue for me?" *See* Government's Trial Exhibit No. 8. Travis Carr testified that he asked this question because he had received collection letters stating that his child support debt had not been paid. [Doc. 152 at 35]. He testified that understood from defendant's response that "he was taking care of the child support." [Id. at 36]; *see also* [id. at 30]; Government's Trial Exhibits Nos. 5–6.

First, defendant's representation that he was taking care of the child support, i.e., paying the child support debt from the family's money, was false and fraudulent because up to the date of the email, and up to today, defendant only made one payment of $1,000 toward Travis Carr's child support debt. *See* Government's Trial Exhibit No. 189.

---

[4]Based on this case law, material omissions made as part of a plan to suppress the truth, such as the defendant's representation that he anticipated filing the Carr tax returns soon, while materially omitting that he did not have the money to pay the taxes associated with those returns, is actionable, and thus is an alternative basis to sustain the convictions related to the defendant's communications with Travis Carr.

In addition, viewing the evidence in the light most favorable to the Government, defendant sent this email to conceal his misappropriation of the Carr client funds and to lull Travis Carr by making him believe that he would use the Carr client funds to pay his child support debt, thus implying that the funds were still held in trust. The lulling nature of this email remains even if there was no agreement to use the family money to pay Travis Carr's child support debt because the email was meant to keep Travis Carr satisfied and so that he did not ask questions about the family's money, especially because he was the only family member that was fully mentally competent. As such, this email is sufficiently related to the initial fraudulent inducement. *Colton*, 231 F.3d at 898.

Count 24 of the Indictment is based on an email defendant sent to Travis Carr on July 22, 2021, which was approximately three (3) months after defendant received the funds to be used to pay the family's delinquent income taxes, and which was approximately five (5) weeks after defendant had fully expended the money but not to pay any of the intended tax debt and only $1,000 toward Travis Carr's child support debt. *See* Government's Trial Exhibits Nos. 9, 170, 188–189, & 263. In the email, defendant was responding to Travis Carr's accusation that he had "no intentions of showing [his] family an accounting of their monies . . .." *See* Government's Trial Exhibit No. 9. In response, defendant stated, "Of course I am. That's what the meeting was for on Friday. I will come out to see him Saturday at 10:00 since Friday is not workable." Id. Travis Carr testified defendant never showed him an accounting of the $1.1 million to which he referred in his email to defendant. [Doc. 152 at 38]. Travis Carr testified that he would have wanted to know if defendant had spent all the money. [Id.].

At the outset, defendant's statement that he would give Travis Carr an accounting of the family's money was false and fraudulent because defendant certainly did not intend to show him how he spent the money paying off defendant's law firm loan, trading in a brokerage account, and buying cryptocurrency, among other misappropriation. Furthermore, viewing the evidence in the light most favorable to the Government, defendant sent this email to conceal his misappropriation of the Carr client funds and to lull Travis Carr by making him believe that defendant would, at some point, give him an accounting showing that the money had only been used as intended. As such, this email is sufficiently related to the initial fraudulent inducement. *Colton*, 231 F.3d at 898.

Finally, the same is true for the mail fraud conviction on Count 1 of the Indictment. This count is based on defendant's mailing of Rocky Tingler's case file to attorney Scott Summers, which included an itemized billing statement claiming over $44,000 in fees and expenses. *See* Government's Trial Exhibits Nos. 128 & 134. Viewing the evidence in the light most favorable to the Government, including attorney Harry Smith's characterization of Mr. Tingler's case as one that was simple and did not need all the work that defendant claimed he did, the billing statement was false and fraudulent and was sent to Mr. Summers to conceal defendant's misappropriation of Mr. Tingler's client funds and to lull Mr. Tingler by making him believe that defendant had earned his fee plus expenses and did not need to return any money to Mr. Tingler. *See* Government's Trial Exhibits Nos. 126–128, 134, 138–140, 251, 253, 255–256, & 266–267. As such, this mailing is sufficiently related to the initial fraudulent inducement to obtain the retainer funds. *Colton*, 231 F.3d at 898.

24

Accordingly, viewing the evidence in the light most favorable to the Government, there is sufficient evidence of material misrepresentation to sustain the mail and wire fraud convictions in Counts 1 (Tingler file), 4 through 16 (Carr IRS checks), and 22 through 24 (Emails to Travis Carr) of the Indictment.

### d. In any event, mail and wire fraud can be based on misappropriation of funds, concealment of prior misappropriation, and lulling even in the absence of initial fraudulent inducement to obtain the funds.

Alternatively, the convictions for mail and wire fraud involving misappropriation, concealment of misappropriation, and lulling can be sustained even without evidence of an initial fraudulent inducement because there is sufficient evidence that money was the object of defendant's scheme to defraud.

As an initial matter, defendant continues to be mistaken that *Kousisis v. United States*, 605 U.S. 114 (2025) limits wire fraud and mail fraud to schemes involving fraudulent inducement.

The Government charged Kousisis and the industrial-painting company he helped manage, Alpha Painting and Construction Co. ("Alpha"), with "wire fraud, asserting that they had **fraudulently induced** [the Pennsylvania Department of Transportation] to award them painting contracts." 605 U.S. at 118 (emphasis added). The question before the Court was whether the Government's "fraudulent-inducement theory" was consistent with the wire fraud statute even though Kousisis and Alpha completed the painting work. *Id*. Because the Court found that "a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim

economically worse off[,]" the Court held that "[a] conviction **premised on a fraudulent inducement** thus comports with § 1343." *Id.* at 124 (emphasis added).

Contrary to defendant's reading, however, the *Kousisis* Court did not hold that a defendant can violate § 1343 only through fraudulent inducement. In fact, the *Kousisis* Court recognized that the fraudulent-inducement theory "criminalizes **a particular species of fraud**: intentionally lying to induce a victim into a transaction that will cost her money or property," before noting that the "language of the wire fraud statute is **undeniably broad**." *Id.* at 135 (internal citation and quotation marks omitted) (emphasis added).

Where the *Kousisis* opinion is instructive is its reaffirmation that "[a] defendant commits federal wire fraud . . . only if he both 'engaged in deception' and had 'money or property' **as 'an object'** of his fraud." *Id.* at 121 (citing *Ciminelli v. United States*, 598 U.S. 306, 312 (2023) (quoting *Kelly v. United States*, 590 U.S. 391, 398 (2020)) (emphasis added). In other words, the Court stated, "[o]btaining the victim's money or property **must have been the 'aim,' not an 'incidental byproduct,'** of the defendant's fraud." *Id.* at 122 (quoting *Kelly*, 590 U.S. at 402, 404) (emphasis added).

In fact, the Supreme Court has spoken about the breadth of mail fraud when discussing the 1909 amendment to the mail fraud statute that added the words "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" after the original phrase "any scheme or artifice to defraud." *McNally v. United States*, 483 U.S. 350, 357 (1987). The *McNally* Court found that adding the phrase "simply made it unmistakable that the statute reached false promises and misrepresentations as to the future[, i.e., fraudulent inducement] as well as other frauds

involving money or property." *Id*. at 359. In other words, the "money-or-property requirement" limits schemes to defraud to "those aimed at causing deprivation of money or property," which can be accomplished in various ways, not just through fraudulent inducement. *Id*. at 358.

The Supreme Court has at least twice held that individuals who retain or misappropriate the money or property of others, regardless of how they acquired it, fall within the purview of mail or wire fraud. *See* **Pasquantino v. United States**, 544 U.S. 349 (2005); *see also* **Carpenter v. United States**, 484 U.S. 19 (1987).

Twenty (20) years ago, the Supreme Court upheld the wire fraud conviction of a defendant accused of wrongfully retaining money or property in **Pasquantino**, which involved a scheme to smuggle large quantities of liquor into Canada, thereby avoiding excise taxes imposed on imports. In deciding that this activity was wire fraud, the Court noted "fraud at common law included a scheme to deprive a victim of his entitlement to money. For instance, a debtor who concealed his assets when settling debts with his creditors thereby committed common-law fraud." 544 U.S. at 356.

### i. Misappropriation is a stand-alone theory that can support a mail fraud or wire fraud conviction.

Nearly forty (40) years ago, the Supreme Court held that the mail and wire fraud statutes reach "the act of embezzlement, which is the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another." **Carpenter**, 484 U.S. at 27 (1987) (citing **Grin v. Shine**, 187 U.S. 181, 189 (1902)); *see also* **United States v. Jones**, 472 F.3d 1136, 1140 (9th Cir. 2007) (upholding wire fraud conviction where defendant fraudulently appropriated money received from investors, even though he did not possess

27

fraudulent intent when he received the money); *United States v. Sullivan*, 522 F.3d 967 (9th Cir. 2008) (upholding mail and wire fraud convictions based on defendants' subsequent fraudulent appropriation).

Viewing the trial record in the light most favorable to the Government, the money of defendant's clients was the object of his mail and wire fraud scheme, which involved several examples of misappropriation, as already detailed above. Accordingly, this Court sustains the convictions involving misappropriation (Counts 4–16, 18, & 20–21) without regard to whether there is sufficient evidence that defendant possessed fraudulent intent when he received the money that was subsequently misappropriated.

### ii. Concealment of Misappropriation and Lulling are stand-alone theories that can support a mail fraud or wire fraud conviction.

Similarly, mail and wire fraud convictions can be sustained based on actions taken to conceal prior misappropriation or to lull or forestall action on the part of those from whom a defendant obtained money, even in the absence of evidence of an initial fraudulent inducement.

Over sixty (60) years ago, the Supreme Court held that "a deliberate, planned use of the mails **after the victims' money ha[s] been obtained**" can be for the purpose of executing a mail fraud scheme, especially when the indictment specifically alleges that the scheme "contemplated from the start the commission of fraudulent activities which were to be and actually were carried out both before and after the money was obtained from the victims." *United States v. Sampson*, 371 U.S. 75, 80 (1962) (emphasis added); *see also United States v. Maze*, 414 U.S. 403 (1974) (describing the mailings in *Sampson* as

being "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place").

Four (4) decades ago, the Supreme Court reaffirmed that "[m]ailings occurring after receipt of the goods obtained by fraud are within the [mail fraud] statute if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" *United States v. Lane*, 474 U.S. 438, 451 (1986) (quoting *Maze*, 414 U.S. at 403 and citing *Sampson*).

It is no surprise, then, that the Fourth Circuit has held that "[l]ulling letters sent to innocent victims for the purpose of advancing a fraudulent and criminal scheme are sufficient to charge mail fraud, even where the letters follow the acquisition of the money in question." *United States v. Snowden*, 770 F.2d 393, 398 (4th Cir. 1985) (citing *Sampson* and *Maze*); *see also United States v. Godwin*, 272 F.3d 659, 668 (4th Cir. 2001) (lulling letters and lulling payments); *United States v. Pierce*, 409 F.3d 228, 232–33 (4th Cir. 2005) (both citing favorably *Snowden*, 770 F.2d at 398).

Viewing the trial record in the light most favorable to the Government, the money of defendant's clients was the object of his mail and wire fraud scheme, which involved several examples of attempts to conceal misappropriation and to lull those from whom defendant misappropriated, as already detailed above. *See* Government's Trial Exhibits Nos. 161–167.

Accordingly, this Court sustains the convictions involving concealment of misappropriation and lulling (Counts 1, 4–16, & 22–24) without regard to whether there is sufficient evidence that defendant possessed fraudulent intent when he received the money.

### 2. There was sufficient evidence, viewed in the light most favorable to the Government, that the mailings and wires were sufficiently closely related to the scheme.

As his second theory for judgment of acquittal, defendant argues that the mail and wire fraud convictions cannot be sustained because they are based on mailings and wires that are not in furtherance of the charged scheme. [Doc. 160 at 32–39].

Concerning mail fraud, this Court instructed the jury that the Government was required to prove that "the use of the mails or a common carrier was closely related to the scheme, in that the defendant either mailed something or caused it to be mailed or delivered by common carrier in an attempt to execute or carry out the scheme." [Doc. 136 at 23].  In this regard, this Court instructed the jury as follows:

> One way that a mailing can be for the purpose of executing a fraudulent scheme is if it is designed to lull the victims into a false sense of security, even if it is incident to an essential part of the scheme. Thus, a mailing that is accurate, routine, or sent after money has been obtained can support a mail fraud conviction, so long as the mailing was designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendant less likely than if no mailings had taken place.

[Id. at 23–24].

Pertaining to wire fraud, this Court similarly instructed the jury that the Government was required to prove "a transmission by a wire, radio, or television communication facility in interstate commerce was, in fact, used in some manner to further, or to advance, or to carry out the scheme to defraud." [Id. at 30].  In this regard, this Court instructed the jury as follows:

> One way that a wire transmission can be for the purpose of executing a fraudulent scheme is if it is designed to lull the victims into a false sense of security, even if it is incident to an essential part of the scheme. Thus, a wire transmission that is accurate, routine, or sent after money has been obtained can support a wire fraud conviction, so long as the wire transmission was designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no [wire transmissions] had taken place.

[Id. at 30–31].

### a.    Obtaining-the-Money Convictions

Counts 2 and 3 of the Indictment were based on the mailings involved in obtaining the Carr Nationwide check and the Giovengo Covestro check.  *See* Government's Trial Exhibits Nos. 166, 199, & 275.  Counts 17 and 19 of the Indictment were based on the bank wires involved in obtaining the other Carr funds. *See* Government's Trial Exhibits Nos. 159 & 170. Based on the evidence of fraudulent inducement and subsequent misappropriation, the aim of the mail and wire fraud scheme was to obtain and then misappropriate client funds. It logically follows, then, that wires and mailings involved in

31

practically obtaining the money to be misappropriated are sufficiently closely related to the scheme. *Kousisis*, 605 U.S. at 124.

### b. Misappropriation Convictions

Counts 4–16 of the Indictment were based on the mailings involved in misappropriating Covestro settlement proceeds to fund the Carr tax checks.[5] *See* Government's Trial Exhibits Nos. 63–68, 71–88, & 279.  Counts 18, 20, and 21 of the Indictment were based on the wires involved in misappropriating the Carr money to fund a payment to defendant's wife's JP Morgan Chase credit card account, to trade in defendant's TD Ameritrade account, and to use defendant's Coinbase account to purchase cryptocurrency. *See* Government's Trial Exhibits Nos. 143–146, 148, 171, & 184. Again, based on the evidence of fraudulent inducement and subsequent misappropriation, the aim of the mail and wire fraud scheme was to obtain and then misappropriate client funds. As such, mailings and wires carrying out the misappropriation are sufficiently closely related to the scheme. *Carpenter*, 484 U.S. at 27.

---

[5]Defendant argues there was insufficient evidence that the Carr tax checks were mailed to the IRS.  The trial record includes certified bank records showing the payments were made via checks, written on an account held in Wheeling, West Virginia, and cashed by the Federal Reserve Bank in Cleveland.  *See* Government's Trial Exhibit No. 198. The trial record includes certified copies of the envelopes in which the related returns were mailed to the IRS, as indicated either by stamps or an intelligent mail barcode showing the mail item was sorted as a U.S. Postal Service facility.  *See* Government's Trial Exhibits Nos. 63–68.  The trial record includes certified transcripts that show the payments were made with filing of the returns. *See* Government's Trial Exhibits Nos. 71–88, 279. Viewing this evidence in the light most favorable to the Government, there was more than sufficient evidence that these payments involved the mail.

### c.    Lulling Convictions (Counts 1, 4–16, 22–24)

Count 1 of the Indictment was based on the mailing of the Tingler file. *See* Government's Trial Exhibit No. 128. Again, Counts 4–16 of the Indictment were based on the mailings of the Carr tax checks. *See* Government's Trial Exhibits Nos. 63–68, 71–88, & 279. Counts 22–24 of the Indictment were based on the wires involved in certain of the defendant's emails with Travis Carr. *See* Government's Trial Exhibits Nos. 7–9.

Rocky Tingler sought the return of the balance of his retainer, along and with the assistance of attorney Scott Summers, who was threatening legal action. *See* Government's Trial Exhibits Nos. 119–127. Considering the evidence of misappropriation of the Tingler client funds, the file that defendant mailed to Mr. Summers was defendant's attempt to convince Mr. Tingler that he was not due the return of any funds, specifically in that the file included both the fee agreement claiming the fee was set or flat and the account statement claiming that the fee had been earned or expended on the case.

Similarly, Travis Carr was asking questions about the tax and child support payments, demanding an accounting of defendant's use of the family's money, making allegations in court filings, and threatening legal action. *See* Government's Trial Exhibits Nos. 7–18.  Considering the evidence of misappropriation of the Carr client funds, defendant's use of other client funds to pay the all-important income taxes via the mail and defendant's reassuring emails to Travis Carr regarding his handling of the family's money were attempts to lull Mr. Carr into a false sense of security.

Therefore, as efforts to placate victims of fraud and to keep the fraud scheme active and ongoing, these lulling actions taken toward Mr. Tingler and Mr. Carr are sufficiently related to his scheme to defraud them of money.

Because defendant's sole challenge to the unlawful monetary transaction convictions depended on the success of his challenge to the fraud convictions, which fails, this Court also sustains those convictions (Counts 25–29).

**B.    New Trial**

Defendant raises four (4) theories which he argues, when taken together, entitle him to a new trial. These bases, which will be addressed in turn, fail to warrant a new trial.

**1.    Improper Closing Argument**

Defendant argues he is entitled to a new trial, in part, because the Government's closing argument misled the jury in representing that a material misrepresentation was made by him "when, in fact, there was no testimony to that effect."  [Doc. 160 at 41]. As explained below, however, the Government's closing argument, to which defendant did not object at trial, does not warrant a new trial.

"[R]eversible prosecutorial misconduct generally has two components: that (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial."  *United States v. Chorman*, 910 F.2d 102, 113 (4th Cir. 1990) (internal citation and quotation marks omitted).

In evaluating whether a prosecutor's remarks were sufficiently prejudicial to warrant reversal, the Fourth Circuit has noted a few relevant factors, namely:

34

(1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant;

(2) whether the remarks were isolated or extensive;

(3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant;

(4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters;

(5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and

(6) whether curative instructions were given to the jury.

*United States v. Scheetz*, 293 F.3d 175, 185–86 (4th Cir.), *cert. denied*, 537 U.S. 963 (2002).

The Fourth Circuit has held that "prosecutors enjoy considerable latitude in presenting arguments to a jury . . . because the adversary system permits the prosecutor to prosecute with earnestness and vigor." *Bates v. Lee*, 308 F.3d 411, 422 (4th Cir. 2002) (internal citation and quotation marks omitted). Consequently, "[c]ommitted advocates do not always present antiseptic closing statements, and the jury is entrusted within reason to resolve such heated clashes of competing views." *Id*.

### a.    "Fraudster" / "Hidden Things" Arguments

As an initial matter, defendant takes issue with counsel for the Government's arguments that defendant concealed material information from his clients "for over a

decade" and that the trial had "revealed him to be the fraudster that he is." [Doc. 160 at 41]; *see also* [Doc. 155 at 2].

First, defendant has not met his burden to show that these statements were improper. Counsel for the Government made these statements as part of an introduction before outlining evidence of defendant's fraud against his clients, including his concealment of his misappropriation of their money, as part of the charged mail and wire fraud scheme.

The jury had heard testimony from Mr. Fluharty, Travis Carr, and Ms. Giovengo that they would not have authorized defendant to use their money for certain expenditures, *see* [Doc. 155 at 105–106, 130, 137, 166, 171, & 234], which certified bank records, admitted during the testimony of the case agent, showed that he had, *see* Government's Trial Exhibits Nos. 145–146, 148, 177–178, 198, 236–238, & 240–242. In other words, the jury received evidence that defendant had successfully concealed this fraud from his clients, and with regard to Mr. Fluharty, defendant had done so for over a decade. As such, counsel for the Government's arguments were supported by the evidence.

Even assuming the use of the word "fraudster" was improper, defendant cannot show that its use prejudicially affected his substantial rights so as to deprive him of a fair trial. The use of this word did not have the tendency to mislead the jury. Rather, it was a descriptor that fit the fraud offenses for which defendant was on trial. The use of this one word was isolated and made at the conclusion of a case in which the proof of guilt was significant. The word was not used to divert attention to extraneous matters since whether defendant had committed fraud, and was thus a fraudster in the charged circumstances, was the central issue of the trial. ***Scheetz***, 293 F.3d at 185–86; *see also **United States v.***

36

*Moore*, 11 F.3d 475, 480–82 (4th Cir. 1993) (although "plain error" for prosecutor to call defendant and witnesses "liars," error held harmless in absence of showing that error affected "the outcome of the trial").

Accordingly, this part of the Government's closing argument does not warrant a new trial.

### b.    Improper Appeals to Sympathy

Next, defendant contends that counsel for the Government improperly appealed to the jury's sympathy by "emphasizing the personal tragedies of witnesses and framing them as 'opportunities'" that he "exploited." [Doc. 160 at 41]. In this regard, defendant argues it was improper for counsel for the Government to refer to the victims of the offenses as "vulnerable people who trusted the defendant" and to assert that he "took advantage of vulnerable people for greed." [Id].

The Government did not make improper appeals to sympathy. The Government offered some explanation, based on the evidence, for how defendant was able to take advantage of the clients from he fraudulently induced and then misappropriated money. *See United States v. Susi*, 378 Fed.App'x. 277, 283–84 (4th Cir. 2010) (unpublished per curiam) (rejecting claim of impropriety for prosecutor's comment in closing implying that the defendant was able to take advantage of the victims because they were vulnerable due to advanced age, noting that the statement properly "called for the jurors to decide whether the witnesses' testimony was plausible based on context"); *see also United States v. Kirvan*, 997 F.2d 963, 964 (1st Cir. 1993) ("[T]he invitation is not an improper appeal to the jury to base its decision on sympathy for the victim but rather a means of asking the

jury to reconstruct the situation in order to decide whether a witness' testimony is plausible.") Nor was it improper to suggest defendant's actions were motivated by greed. *Susi*, 378 Fed.App'x. at 283 (holding that the prosecutor's statement that the defendant was a "greedy, merciless man" had not "crossed the line of vigorous advocacy").

In any event, defendant cannot establish prejudice because these references to the vulnerability of the victims and the greed of defendant were isolated and made at the conclusion of a case in which the proof of guilt was significant. *Scheetz*, 293 F.3d at 185–86.

Accordingly, this part of the Government's closing argument does not warrant a new trial.

### c.    "Pejorative Labels and Uncharged-Crime Rhetoric"

Defendant also claims that counsel for the Government "relied heavily on pejorative labels and uncharged-crime rhetoric, specifically described the scheme as a "Ponzi scheme," referring to "dirty money," and characterizing the defendant as a "magician of lies." [Doc. 160 at 42]. Defendant argues that "[t]his language improperly suggested criminal propensity and invited conviction on a theory of generalized dishonesty rather than proof of mail or wire fraud by material misrepresentation." [Id.].

The scheme was a Ponzi scheme, which is a type of scheme that sustains, as it did in this case, convictions for mail and wire fraud. The case did involve "dirty money," which is, in fact, an element of the unlawful monetary transaction charges, i.e., that defendant conducted certain financial transactions with criminal proceeds. 18 U.S.C. § 1957. There is

no evidence that the term "magician of lies" crossed the line of vigorous advocacy. *Susi*, 378 Fed.App'x. at 283.

In any event, defendant cannot establish prejudice because the use of these "pejorative" labels was isolated and made at the conclusion of a case in which the proof of guilt was significant.  *Scheetz*, 293 F.3d at 185–86.

Accordingly, this part of the Government's closing argument does not warrant a new trial.

###     d.     Misstatements and Minimizations of the Law

Finally, defendant asserts that counsel for the Government misstated and minimized the law by "telling the jury [he] would 'translate' the court's instructions and reduce them to whether [d]efendant 'came up with a plan to cheat his clients out of money,' thereby collapsing the essential element of a material misrepresentation into a generalized allegation of unfairness or unethical conduct."  [Doc. 160 at 42].

This was not a misstatement or even a minimization of the law. Of course, to avoid impropriety, counsel for the Government was not restricted to the archaic language of the over 100-year-old mail and wire fraud statutes, e.g., "having devised or intended to devise a scheme."  Even if this were an inaccurate lay translation of that first element of both offenses, defendant cannot establish prejudice in that it misled the jury since the Court instructed the jury after closing arguments.

Accordingly, this part of the Government's closing argument does not warrant a new trial.

### 2.  Denial of Mistrial regarding Herman Lantz.

Defendant argues he is entitled to a new trial, in part, because this Court did not grant his request for a mistrial based on Government witness Herman Lantz's testimony that Mr. Lantz suggested the state court order defendant to deposit the Giovengo settlement proceeds "after the ethics opinion was issued." [Id. at 43]. Because this Court was correct to deny defendant's request for a mistrial, this Court finds this it is not a sufficient basis for a new trial.

As an initial matter, it was the Government's cautious suggestion that the parties and witnesses would not mention, with any revealing specificity, defendant's lawyer disciplinary proceedings. [Doc. 26]. This Court endorsed the idea but, importantly, did not rule that such mention would be unduly prejudicial under Rule 403. [Doc. 94].

Second, when the testimony occurred, defendant did not request an immediate curative instruction, nor did he request that this Court strike the testimony.

Third, in denying the request for mistrial, this Court correctly applied the law. "The decision to declare a mistrial is left to the 'sound discretion' of the [trial] judge, but 'the power ought to be used with greatest caution, under urgent circumstances, and for very plain and obvious causes.'" *Renico v. Lett*, 559 U.S. 766, 773–74 (2010) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)). In declaring a mistrial, "the district court should consider whether there are less drastic alternatives to declaring a mistrial." *United States v. Smith*, 44 F.3d 1259, 1268 (4th Cir. 1995) (citing *United States v. Jorn*, 400 U.S. 470, 485–86 (1970)). Less drastic alternatives include limiting and curative instructions to the jury. *See, e.g.*, *United States v. Zelaya*, 908 F.3d 920, 929 (4th Cir.

2018) (no abuse of discretion in denying mistrial where government witness briefly referenced an uncharged murder). And, while evidence of other bad acts may be prejudicial, "that does not mean that any reference to an uncharged offense, no matter how brief and attenuated it may be, compels a mistrial." *United States v. Hunt*, 99 F.4th 161, 192–93 (4th Cir. 2024).

Fourth, this Court offered defendant that it would give a cautionary instruction, but defendant said he would consider it but then never requested one. *Hunt*, 99 F.4th at 192–93 ("And because 'we generally follow the presumption that the jury obeyed the limiting instructions of the district court' . . . 'no prejudice exists if the jury could make individual guilt determinations by following the court's cautionary instructions.'") (quoting *United States v. Williams*, 461 F.3d 441, 451 (4th Cir. 2006), and *United States v. Hart*, 91 F.4th 732, 745 (4th Cir. 2024)); *see also United States v. Saint Louis*, 889 F.3d 145, 155 (4th Cir. 2018) (no error where testimony was introduced about an uncharged rape by another person during kidnapping as jury was instructed to disregard and "[w]hen cautionary instructions are given, '[w]e presume that juries follow such instructions.'") (quoting *United States v. Johnson*, 587 F.3d 625, 631 (4th Cir. 2009)).

Additionally, this Court discussed the admission of evidence of lawyer disciplinary proceedings in criminal cases while denying defendant's motion for mistrial. In *United States v. Delapena*, 2025 WL 360770 (M.D. Fla. Jan. 31, 2025), the court ultimately denied a defendant's motion to exclude evidence regarding a Florida bar disciplinary proceeding. In *United States v. Cunningham*, 679 F.3d 355 (6th Cir. 2012), the Sixth

Circuit affirmed a conviction for wire fraud in a case where the trial court admitted the allegations and factual findings from a disbarment proceeding.

For all these reasons, this Court's denial of a mistrial does not require a new trial.

### 3. Summary Charts

Defendant argues he is entitled to a new trial, in part, because this Court admitted summary charts under Rule 1006, specifically Government's Trial Exhibits Nos. 261–267, which outlined the transactions that occurred in defendant's IOLTA and operating accounts following the deposits of the subject client funds. Because this Court was correct to admit the summary charts under Rule 1006, this Court finds that their admission is not a sufficient basis for a new trial.

As an initial matter, this Court was correct to find that the exhibits met the requirements of Rule 1006. The exhibits summarized evidence that was admissible and were, in fact, admitted, i.e., the certified bank records. *See* Government's Trial Exhibits Nos. 257–259. The exhibits were probative of whether defendant mishandled client funds as part of his scheme to defraud and obtain money from his clients, an element of the mail and wire fraud offenses. Fed. R. Evid. 401; 18 U.S.C. §§ 1341, 1343. The exhibits summarized evidence that was voluminous. In fact, because the scheme spanned more than a decade and involved at least three (3) bank accounts, the certified bank records comprised thousands of pages of documents, which could not have been conveniently examined in court, as evidence by the case agent's testimony that he spent more than 500 hours reviewing the records. [Doc. 165 at 233]. The exhibits' probative value was not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

42

*See* Fed. R. Evid. 403. There was no danger of unfair prejudice, confusing the issues, or misleading the jury by admitting exhibits that accurately summarized certified business records, with a focus on calculating the expenditure of funds, and doing so only after the FBI case agent had established an appropriate foundation.[6]  [Doc. 165 at 232–235]; *see also* Fed. R. Evid. 1006(a) ("The court may admit as evidence a summary, chart, or **calculation** . . ..") (emphasis added); ***United States v. Aubrey***, 800 F.3d 1115, 1129–31 (9th Cir. 2015) (finding no abuse of discretion in admission of summaries of voluminous bank records that were prepared using a certain accounting method). Moreover, there was no undue delay or waste of time. In fact, the exhibit saved time. Nor were the exhibits needlessly cumulative because their purpose was to summarize voluminous evidence, and, as the rule makes clear, the fact that the underlying records had been admitted is not dispositive. *See* Fed. R. Evid. 1006(a) (courts may allow summaries of voluminous records "whether or not they have been introduced into evidence").

Even if it was error to admit the charts as summaries under Rule 1006, defendant has not met his burden to show that the error affected his substantial rights, for several reasons.

First, this Court instructed the jury that because the summary exhibits were "only as good as the underlying supporting material," they should "give them only such weight" as they thought "the underlying material deserve[d]." [Doc. 136 at 10]. In this case, although

---

[6]Defendant claims the exhibits omitted the fact that there were sometimes other deposits than the subject client funds. [Doc. 160 at 45]. This is not correct, however. At the end of the charts of outgoing transactions the exhibits include a section called "Subsequent Deposits Prior to Funds Being Fully Expended." *See, e.g.*, Government's Trial Exhibit No. 263 at 4.

not required by Rule 1006, the underlying materials were also in evidence. *See* Government's Trial Exhibits Nos. 257–259.

Second, although not required by Rule 1006, the Government published and reviewed several of the underlying materials during the case agent's testimony. [Doc. 165 at 134–232].

Third, the Government would have been able to, alternatively, show the jury the charts as illustrative aids and refer to the illustrative aids in its closing argument. *See* Fed. R. Evid. 107 ("The court may allow a party present an illustrative aid to help the trier of fact understand the evidence or argument . . .."); *see also* **United States v. Oloyede**, 933 F.3d 302, 311 (4th Cir. 2019) (finding improper admission of charts under Rule 1006 did not affect the defendants' substantial rights because "the same information in the same form could have been shown to the jury under Rule 611(a)[,]" the rule then used for illustrative aids prior to the addition of Rule 107).

For all these reasons, this Court's admission of summary charts under Rule 1006 does not require a new trial.

### 4.    <u>Evidence of Good Faith</u>

Defendant argues he is entitled to a new trial, in part, because "the record reflects affirmative conduct consistent with good faith." [Doc. 160 at 47]. Examples of good faith conduct, according to defendant, were his sending the Carr tax checks to the IRS, sending Mr. Tingler his case file, returning money to Mr. Fluharty, and waiving his expenses for Ms. Giovengo. [Id. at 47–48].

What defendant calls good faith conduct, this Court calls lulling. Defendant sent the Carr tax checks, funded by Covestro settlement proceeds, to lull Travis Carr into a false sense of security and to conceal the fact that he had misappropriated the money that the family intended to be used to pay the taxes. Defendant sent the case file to Mr. Tingler to try to convince him, falsely, that the fee had been rightfully earned or was a flat or set fee from the start. Defendant reimbursed Mr. Fluharty with other client funds to conceal from Mr. Fluharty that he had misused Mr. Fluharty's money, which he had promised to hold in trust, to purchase his own residence.

Finally, defendant did not waive expenses for Ms. Giovengo. The state court disallowed the expenses when defendant did not appear for the hearing on June 9, 2025, after defendant had been suspended and indicted. [Doc. 152 at 175]. Even if waived, most of the expenses were fraudulent in the first place.

In any event, the jury heard evidence of this so-called good faith conduct and they were instructed by the Court that "[g]ood faith on the part of the defendant is a complete defense to a charge of mail fraud or wire fraud [because a] person who acts in good faith cannot be guilty of a crime which requires fraudulent intent." [Doc. 136 at 22]. The jury simply found the evidence described by defendant as evincing good faith was nothing of the sort. Dissatisfaction with the jury's verdict is not a basis for a new trial.

## IV. CONCLUSION

For the reasons as stated herein, defendant's Motion [**Doc. 159**] is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein and is further directed to provide a copy to the *pro se* defendant via the CM/ECF system.

**DATED**: January 29, 2026.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE