**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**CRIM. ACT. NO. 5:25-CR-34**
Judge Bailey

**PAUL J. HARRIS,**

Defendant.

## ORDER

Pending before this Court is Defendant's Motion for New Trial Pursuant to ***Napue v. Illinois*** and Rule 33(b)(1) of the Federal Rules of Criminal Procedure [Doc. 170], filed January 19, 2026.  On January 22, 2026, defendant filed a Supplement to his Motion for New Trial. [Doc. 171].  The Government filed a Response [Doc. 172] on January 27, 2026. Defendant's Reply [Doc. 176] was filed February 3, 2026.  A hearing on defendant's Motion was held March 9, 2026. [Doc. 187].  This matter is ripe for adjudication.  For the reasons contained herein, defendant's Motion [**Doc. 170**] is denied.

## I. BACKGROUND

On September 16, 2025, a grand jury sitting in Martinsburg, West Virginia, returned a 29-count Indictment against defendant.  [Doc. 1]. The Indictment charged defendant, an attorney, with mail and wire fraud arising from his alleged fraudulent obtaining and mishandling of client funds, including his commingling of client funds with non-client funds in his law firm operating account and his conversion of client funds to his own use.

The Indictment also charged defendant with engaging in unlawful monetary transactions with proceeds of wire fraud.

From November 3, 2025, to November 13, 2025, this Court presided over a trial on the Indictment.

On November 3, 2025, the Government called Travis Carr ("Mr. Carr") as its first witness. [Doc. 152 at 2]. Mr. Carr testified about a wire of $300,000 from his family which was sent to defendant on November 30, 2020. [Id. at 5–6, 11]. Mr. Carr testified he believed defendant "was going to use it to take care of [his sister] Brittany's conservatorship reporting and whatever things that needed taken care of in that capacity." [Id. at 11]. Mr. Carr testified he did not authorize defendant to hold the money anywhere but in his client trust account, nor did he authorize defendant to use the money to pay defendant's wife's credit card bill, or to fund any payments to Greg Fluharty ("Mr. Fluharty"). [Id. at 12–13]. During his direct examination, Mr. Carr was shown a November 22, 2020 fee agreement concerning a retainer in an unspecified amount for "various family matters" purportedly signed by his father and the defendant. [Id. at 8]; Government's Trial Exhibit No. 1. Mr. Carr testified he was with his father in Iowa on November 22, 2020; that he did not see his father receive or sign the purported retainer agreement; and that he had only seen the document for the first time when the Government showed him during preparation for his testimony. [Id. at 6–9]. Mr. Carr testified that he, his father, and his sister first arrived in West Virginia from Iowa on November 27, 2020. [Id. at 6].

On the topic of his father's Nationwide settlement check, Travis Carr testified the defendant "got a check for $200,000," which Mr. Carr knew because Nationwide sent him "a letter stating that." [Id. at 20]. When asked whether defendant "ever [told Mr. Carr]

2

himself that [defendant]" got the check, Mr. Carr testified, "Not really, no. No." [Id.]. Mr. Carr then testified he eventually discussed the check with defendant but "not initially." [Id.].

On cross-examination, defendant questioned Mr. Carr about the accuracy of his testimony concerning when he and his family arrived in West Virginia, suggesting that the family arrived on November 22, 2020, the date of the purported retainer agreement. [Id. at 68–72]. On redirect, the Court admitted, as a prior consistent statement, an excerpt from Mr. Carr's February 20, 2024 testimony in defendant's lawyer disciplinary proceeding, such excerpt affirming Mr. Carr's testimony that he and his family arrived in West Virginia on November 27, 2020. [Id. at 102]; Government's Trial Exhibit No. 292.

On November 10, 2025, Anastasia "Stacy" Nixon," defendant's longtime paralegal "[o]ff and on for 20 years or so," *see* [Doc. 173 at 87], testified as a defense witness that she observed Thomas Carr sign the purported retainer agreement in Wheeling, West Virginia, outside of the defendant's office, on November 22, 2020. [Id. at 97–100]. During cross-examination, Ms. Nixon was asked about testifying in defendant's lawyer disciplinary proceeding that she remained inside the defendant's office when the Carr family arrived at defendant's office in November of 2020, which was inconsistent with her trial testimony that she was outside to observe Thomas Carr sign the purported retainer agreement. [Id. at 185].

On November 13, 2025, the jury returned a verdict of guilty on all counts. [Doc. 137].

On January 20, 2026, the defendant filed this Motion requesting a new trial based on newly discovered evidence or for the Court to set aside his convictions based on a due process violation [Doc. 170]. The asserted newly discovered evidence is text messages

3

from November 22, 2020, between Travis Carr and Stacy Nixon, showing Travis Carr communicating that he and his family had arrived in West Virginia that day [Doc. 170-1]. Defendant claims the Government violated his due process by using Travis Carr's testimony, which "the Government knew or should have known was false" regarding the arrival date. [Doc. 170 at 2].

On January 22, 2026, defendant filed a supplement to his Motion. [Doc. 171]. Defendant claims that he also newly discovered text messages from March 22, 2021, between Travis Carr and Stacy Nixon, showing that Nixon sent him a copy of the Nationwide check. [Doc. 171-1]. Defendant argues that this entitles him to a new trial based on newly discovered evidence or warrants the Court setting aside his convictions based on a due process violation because, again, the Government knew or should have known that Travis's testimony regarding his knowledge of the check was false. *See* [Doc. 171].

## II. <u>LEGAL STANDARDS</u>

### A. <u>New Trial Based on Newly Discovered Evidence</u>

To receive a new trial based on newly discovered evidence under Rule 33 of the Federal Rules of Criminal Procedure, a defendant must demonstrate: (1) the evidence is newly discovered; (2) he has been diligent in uncovering it; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to the issues involved; and (5) the evidence would probably produce an acquittal. ***United States v. Lighty***, 616 F.3d 321, 374 (4th Cir. 2010).

4

**B. Due Process Violation Based on False Testimony**

Under the Supreme Court's decision in ***Napue v. People of State of Illinois***, 360 U.S. 264 (1959), the Government may not knowingly use false evidence, including false testimony, to obtain a tainted conviction or allow it to go uncorrected when it appears. ***United States v. Chavez***, 894 F.3d 593, 599 (4th Cir. 2018). Convictions obtained by the knowing use of perjured testimony are fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. ***Id***. at 601.

## III. DISCUSSION

Defendant requests a new trial, arguing the text messages between Travis Carr and Stacy Nixon are newly discovered evidence requiring a new trial. In the alternative, defendant requests the Court set aside the convictions on counts involving the Carr family because the Government's use of Travis Carr's testimony violated his due process. As explained below, both requests are rejected as meritless.

**A. Defendant has failed to establish a new trial is warranted based on the text messages between Travis Carr and Stacy Nixon.**

Assuming the text messages are newly discovered (and authentic) evidence, the messages do not warrant a new trial because defendant was not diligent in uncovering them; they are merely impeaching of Travis Carr's testimony; they would not probably produce an acquittal; and, while the arrival-in-West Virginia messages appear to be material, the Nationwide check messages are not.

### 1. <u>Diligence</u>

To satisfy the diligence element, there must be facts alleged "from which the court may infer diligence on the part of the movant[.]" ***United States v. Custis***, 988 F.2d 1355, 1359 (4th Cir. 1993).

Following is defendant's entire argument for why he could not have obtained the November 22, 2020 messages before trial with due diligence:

> The text messages at issue were recovered from iCloud message records only after trial. They were not in Defendant's possession and were not reasonably discoverable prior to trial despite Defendant's diligence. The fee agreement and Defendant's billing records were admitted as exhibits in the ethics proceeding, and at no time during that proceeding was the validity of the fee agreement questioned.

[Doc. 170 at 4].  In his supplement, regarding the March 22, 2021 text messages, defendant states: "The iCloud records were recently discovered by Anastasia 'Stacy' Nixon after she tried to clear storage on her phone. She did not know these messages were being stored in the iCloud account." [Doc. 171 at 1]. The Court assumes defendant meant to apply this account of discovery to the November 22, 2020 messages as well.

Defendant is correct that the November 22, 2020 retainer agreement was admitted by him as an exhibit in his lawyer disciplinary proceeding. However, it is not entirely accurate to state that the validity of the agreement was never questioned during that proceeding.

6

On February 21, 2024, defendant testified in his lawyer disciplinary proceeding. *See* [Doc. 174-3 at 63–121; 443–554]. The Office of Disciplinary Counsel ("ODC") attorney asked defendant if he had a retainer agreement for the initial Carr payment of $300,000 on November 30, 2020. [Id. at 90–91]. Defendant testified that the November 22, 2020 retainer agreement covered the $300,000. [Id. at 91]. The ODC attorney questioned why the retainer agreement did not have an amount. [Id]. Defendant gratuitously explained why the subject of the agreement was "Various Family Matters." [Id. at 91–92]. The ODC attorney questioned whether defendant had earned $228,000 for this purported retainer by the end of December 2020. [Id. at 93]. The panel subcommittee also questioned defendant about the purported retainer. [Id. at 545–547]. This was the same lawyer disciplinary proceeding where defendant testified falsely to using the Nationwide settlement proceeds to pay the Carrs' delinquent income taxes. *See* Government's Trial Exhibit No. 269.

More relevant to defendant's lack of diligence regarding the November 22, 2020 text messages, however, is that the day prior Travis Carr had testified, during the lawyer disciplinary proceeding, that he and his family first arrived in West Virginia on November 27, 2020. *See* Government's Trial Exhibit No. 292. This means that almost twenty-one (21) months prior to trial, defendant was aware that Travis Carr would testify that he and his family arrived in West Virginia five (5) days after the purported execution of the November 22, 2020 retainer agreement. During the same lawyer disciplinary appearance, Travis Carr testified as to his knowledge of the Nationwide check, specifically that the check was "made out to [the defendant] and my dad, for some reason, and not solely to my dad." [Doc. 174-4 at 462].

7

Moreover, defendant had readily available means to obtain the text messages, specifically to request them from the other party to the communications, Stacy Nixon, his paralegal whom he presumably had nearly daily contact. As the trial record reflects, it certainly would not have been the first time defendant would have obtained text messages from Stacy Nixon between her and Travis Carr.

In May 2022, Travis Carr made a *pro se* filing in his sister's guardianship matter, making allegations of impropriety against defendant including about a "romantic relationship initiated by Harris Law Firm paralegal Anastasia Nixon . . .." Government's Trial Exhibit No. 14. Two (2) hours and twenty (20) minutes later, defendant filed a response, which attached copies of text messages between Stacy Nixon and Travis Carr. *See* Government's Trial Exhibit No. 15; *see also* [Doc. 152 at 54 (testimony of Travis Carr that he was surprised to see these text messages attached to the defendant's court filing because, "It was private. It was supposed to be between the two of us.")]. The attached text messages must have been sourced from Stacy Nixon, based on the appearance of "Travis" at the top of the messages, similar to those attached to the instant Motion. Thus, in a mere 140 minutes, defendant was able to obtain text messages from Stacy Nixon, between her and Travis Carr, and attach them to a court filing.

By the time of defendant's Indictment on September 16, 2025, he must have known that the validity of the November 22, 2020 retainer agreement was being questioned. *See* [Doc. 1 at p. 3, ¶ 7 (referring to the $300,000 transfer as money "to be used to cure the income tax and child support delinquencies")]. This was six (6) weeks before trial. Without a doubt, defendant knew the validity of the retainer agreement was being

questioned when it was shown to Travis Carr during his trial testimony on November 3, 2025. This was one (1) week before Stacy Nixon testified as a defense witness.

Whether twenty-one (21) months, six (6) weeks, or one (1) week, defendant had reason and more than enough time to obtain the subject text messages from Stacy Nixon, especially given his history of obtaining text messages from her, with the same party (Travis Carr), in a matter of minutes.  No testimony from Ms. Nixon at the March 9, 2026 hearing would support an opposite conclusion.  Accordingly, defendant has failed to show that he exercised due diligence.

### 2. **Merely Impeaching**

Defendant must also establish the text messages are not "merely impeaching." *Lighty*, 616 F.3d at 374. In this regard, the Fourth Circuit has emphasized that "new evidence going only to the credibility of a witness is not sufficient to justify the granting of a new trial." ***United States v. Stockton***, 788 F.2d 210, 220 (4th Cir. 1986) (citation omitted).

The November 22, 2020 messages are merely impeaching of Travis Carr's testimony that he and his family arrived in West Virginia on November 27, 2020. The messages do not prove that Thomas Carr met with defendant or signed the retainer agreement on November 22, 2020.  The messages do not prove that defendant earned all the otherwise misappropriated money as a fee.

It is not clear that the March 22, 2021 messages even rise to the level of impeachment. First, it is not unfathomable to think that Travis Carr received a letter from Nationwide regarding the settlement check. Second, Travis Carr was asked whether the

defendant, "himself," ever told him about the check, and he said no, but that he had discussed the check with him "[a]fter a while." [Doc. 152 at 20]. On cross-examination, defendant did not even find it important enough to ask Travis Carr about how he learned about the check. Instead, defendant inquired whether Thomas Carr signed the check, to which Travis replied, "I believe so, yes." [Id. at 83]. And he inquired whether Thomas Carr signed a distribution sheet, to which Travis replied that he had never seen such a document, which was why he did not "know what happened to" the money. [Id. at 83–84]. At no time, during direct or cross, was Travis Carr asked if anyone other than the defendant, including Stacy Nixon, had initially told him about the check. No one knows what Travis Carr would have testified. This only emphasizes that, at best, the March 22, 2021 messages would be merely impeaching.

Accordingly, defendant has failed to show that the messages are not merely impeaching.

### 3. **Materiality**

Next, defendant must show that the text messages were material to the issues involved at trial, such as negating criminal intent. *United States v. Fulcher*, 250 F.3d 244, 251–52 (4th Cir. 2001).

For the purposes of this Order, the Court acknowledges the materiality of the arrival-in-West Virginia messages. However, the Court does not acknowledge the materiality of the Nationwide check messages because they are clearly not material.

As explained in more detail below, when addressing the probable acquittal element, it is immaterial whether defendant initially informed Travis Carr of his receipt of the

Nationwide check because it is not relevant to defendant's attempt to negate his criminal intent. What is material is that by signing the fee agreement regarding the Nationwide representation, Travis Carr authorized defendant to handle the Nationwide settlement proceeds on the condition that defendant would keep only 40% as his fee. What is, therefore, even more material is that defendant, thereafter, converted to his own use all the proceeds without authorization, and then, he lied about it three (3) times, including under oath during his lawyer disciplinary proceedings. These issues concern criminal intent, not whether defendant first informed Travis Carr that he received the check, a topic not addressed by the Indictment.

Accordingly, the defendant has failed to show that the Nationwide check messages are material.

### 4. **Probable Acquittal**

Finally, defendant must show the text messages would probably produce an acquittal. *Lighty*, 616 F.3d at 374. As explained below, neither set of text messages, even taken together, would probably produce an acquittal because compelling evidence of fraud remains.

### a. **November 22, 2020 Messages (Arrival Messages)**

As applied to the November 22, 2020 messages, defendant must show that if the jury had the benefit of these text messages, it would have concluded that: (1) Travis Carr and his family arrived in West Virginia on November 22, 2020; (2) Thomas Carr executed the retainer agreement on that date; and (3) defendant earned as a fee all the Carr money

he spent; and thus, that the jury probably would have acquitted him on the Carr-related charges.  This the defendant cannot show.

As an initial matter, even assuming the text messages tend to show that Travis Carr and his family arrived in West Virginia on November 22, 2020, the messages do not establish that Thomas Carr signed the purported retainer agreement.  Specifically, defendant's exhibit of the messages [Doc. 170-1] includes the following exchange on November 21, 2020:

STACY NIXON: Bring the power of attorney documents with you.

TRAVIS CARR: I brought everything.

At trial, Travis Carr testified that prior to leaving for West Virginia he had become power of attorney for his father.  [Doc. 152 at 4]. He also testified that upon arriving in West Virginia he became the power of attorney there based on defendant's advice. [Id. at 10]. In other words, even with the text messages tending to show that Thomas Carr was in West Virginia on the date of the retainer agreement, the jury would probably still question whether Thomas Carr, in fact, executed the agreement, when (1) the defendant's paralegal was aware that Travis Carr was the power of attorney for his father; (2) she was asking Travis Carr to bring the power of attorney documents with him; and (3) Travis Carr subsequently became power of attorney in West Virginia, upon the defendant's advice. And this is before considering that Travis Carr signed the other two (2) fee agreements as power of attorney, *see* Government's Trial Exhibits Nos. 3 & 4, including one (1) that was executed just two (2) weeks later, *see* Government's Trial Exhibit No. 3, and that the defendant-prepared tax returns for Thomas Carr said, "DISABLED/UNABLE TO SIGN," *see e.g.*, Government's Trial Exhibit No. 35.

12

Another reason that the text messages do not establish that Thomas Carr signed the agreement is that a jury would still hear Stacy Nixon cross-examined about testifying in defendant's lawyer disciplinary proceeding that she remained inside the defendant's office when the Carr family arrived in November 2020, which was inconsistent with her trial testimony that she was outside to observe Thomas Carr sign the purported retainer agreement.  [Doc. 173 at 185].

In any event, the trial record contains much more than simply the timeline issue surrounding the retainer agreement's purported execution for the jury to find that the retainer agreement was fraudulent or, even if in fact executed, that the defendant had not earned all the Carr funds he spent.

Burton Hunter, retained by the Carr family to help them investigate defendant's handling of their client funds, testified that he first received the retainer agreement in February 2024, from a member of the body handling defendant's lawyer disciplinary proceedings.  [Doc. 173 at 51–55]. It was not in the file he received from defendant in August 2022. [Id. at 20–21; 51–55; 63–66].

Without the timeline issue surrounding the retainer agreement's purported execution, the first appearance of the agreement only years later in defendant's lawyer disciplinary proceedings, and its absence from the forwarded case file, would more probably cause the jury to question the validity of the agreement or whether defendant earned to money as his fee, than to acquit.

Moreover, the jury received in evidence a letter that defendant emailed to Travis Carr in June 2021, which stated: "In early May 2021, all of us discovered, *for the first time*,

that the tax returns for the conservatorship and for Tom and Jackie individually, have not been filed since 2011." *See* Government Trial Exhibit No. 7 (emphasis added).

Without the timeline issue surrounding the retainer agreement's purported execution, defendant's own statement in this letter that he and the Carrs had not discovered the tax issues until six (6) months after the retainer agreement would more probably cause the jury to question the validity of the agreement or whether the defendant earned to money as his fee, than to acquit.

Probably most compelling, the jury received in evidence bank records and a summary exhibit showing that the $300,000 received on November 30, 2020, was spent in full by January 25, 2021. *See* Government's Trial Exhibits Nos. 165 & 261.

Without the timeline issue surrounding the retainer agreement's purported execution, the proposed prospect of defendant having earned $300,000 in just 56 days (a rate of more than $5,000 per day, seven (7) days a week) on an uncorroborated and unreasonable hunch that Thomas Carr (a stroke survivor and recent widower) and Brittany Carr (mentally disabled) might be under federal criminal tax investigation for misdemeanor failure to file returns and pay taxes remains ludicrous. No reasonable jury would review the December 2020 transfers from defendant's trust account to his operating account, which occurred on nearly a daily basis and included transfers of $50,000, $25,000 (twice), and $20,000, and conclude that he earned these monies as his fee.

And this is before considering defendant's expenditure of these funds from his operating account, including to fund a $20,000 check to Mr. Fluharty, which was funded by the $50,000 transfer, *see* Government's Trial Exhibits Nos. 162 & 163, or Mr. Fluharty's testimony about requesting his money back, which the jury saw in certified records that

14

defendant had already spent, including to purchase his current residence. Clearly then, this remaining accounting evidence would more probably cause the jury to question the validity of the agreement or, at the very least, whether defendant earned the money as his fee, than to acquit.

In addition, the jury received evidence that defendant made several false statements about his use of other Carr funds unrelated to any retainer agreement. In a May 2022 court filing, defendant stated falsely that he used the Nationwide proceeds to pay the Carrs' delinquent income taxes. *See* Government's Trial Exhibit No. 17. He repeated this false statement in his August 2023 filing and February 2024 testimony in his lawyer disciplinary proceedings. *See* Government's Trial Exhibits Nos. 268 & 269.  In the same February 2024 testimony, defendant falsely testified that he mailed the Carr tax checks in March or April 2022, not in 2023, even though bank records show that he did not have the money in his account to fund the checks in March or April 2022, but only in 2023, after the Covestro settlement funds were deposited. Id.; Government's Trial Exhibits Nos. 194–207.

Without the timeline issue surrounding the retainer agreement's purported execution, the fact that defendant repeatedly lied about his handling of other Carr client funds, including giving false sworn testimony, would more probably cause the jury to question the validity of the agreement or whether defendant earned the money as his fee, than to acquit.

Finally, it is improbable that the jury considered the validity of the purported retainer agreement, or whether defendant earned the money as his fee, completely independently from the evidence concerning defendant's fraudulent dealings with Mr. Fluharty, Michelle Giovengo, and Rocky Tingler, especially because the evidence tends to establish a *modus*

15

*operandi*, namely: obtain money, misappropriate money, and then create false documents regarding the handling of the money or to claim rightful entitlement to the money. For Mr. Fluharty, the false document was a trust agreement. *See* Government's Trial Exhibit No. 114. There was no trust; rather, bank records show that the money was deposited in defendant's client trust account, transferred to his law firm account, and misappropriated from there. *See*, *e.g.*, Government's Trial Exhibits Nos. 236, 237, & 238. For Ms. Giovengo, the false document was the expense document claiming false expenses. *See* Government's Trial Exhibit No. 100. For Mr. Tingler, the false document was, significantly, a fee agreement claiming that the $50,000 was a fixed fee. *See* Government's Trial Exhibit No. 134. Mr. Tingler's case also, very similarly, included an invoice with false line items, including legal research totaling $23,000. Id.

Without the timeline issue surrounding the retainer agreement's purported execution, the evidence that defendant's practice was to create false documents regarding the handling of client funds and the earning of fees and expenses to conceal his misappropriation of client funds, would more probably cause the jury to question the validity of the agreement or whether defendant earned the money as his fee, than to acquit.

In sum, defendant cannot establish the absence of the timeline issue would probably cause the jury to acquit him because it is more probable that the jury would convict on the remaining evidence, which establishes that he misappropriated the funds; he did not earn them.

**b. March 21, 2021 Text Messages (Nationwide Check Messages)**

This Court does not believe text messages showing that the defendant's paralegal sent Travis Carr a copy of the Nationwide check would probably result in an acquittal.

Whether defendant or his paralegal told Travis Carr about the check is not material whatsoever to whether fraudulent inducement was involved in defendant's obtaining control over the money or whether he subsequently misappropriated the money.

Compelling evidence of fraudulent inducement and misappropriation remains. The trial record includes a written fee agreement, dated January 28, 2021, between defendant and Travis Carr, as power of attorney for Thomas Carr. *See* Government's Trial Exhibit No. 4. In the fee agreement, defendant represented that he would handle the insurance claim and take a fee of 40% plus expenses. Id. By signing the agreement, Travis Carr agreed to these terms as a precondition for defendant receiving and handling the insurance proceeds. Id. As far as expenses, defendant's own accounting records do not include any expenses related to this representation. *See* Defense Exhibit No. 9 at 26–28. Despite these promises in the fee agreement, defendant did not keep only 40% of the proceeds. As part of expending the funds in full by April 19, 2021, which defendant deposited only with the co-signature of Thomas Carr, he used the money to fund a check of $50,000 to Greg Fluharty, written within a few days of depositing the Nationwide check. *See* Government's Trial Exhibits Nos. 166, 169, & 275.

But wait, there remains even more evidence of a fraudulent scheme regarding the Nationwide check. The jury received evidence showing that defendant later claimed falsely in a May 2022 court filing, an August 2023 administrative proceeding filing, and during his

February 2024 administrative hearing testimony that Thomas Carr's portion of the Nationwide insurance proceeds were used to pay the family's outstanding tax liabilities. *See* Government's Trial Exhibits. Nos. 17, 268, & 269.

In sum, defendant cannot establish that the fact that Stacy Nixon texted Travis Carr a photograph of the Nationwide check would probably cause the jury to acquit him because it is more probable that the jury would convict on the remaining evidence, which establishes that he fraudulently obtained and misappropriated the money and then lied about it, including under oath.

Therefore, defendant has failed to make the requisite showings for a new trial on newly discovered evidence, and his request is denied.

### B. **Defendant fails to establish a due process violation based on Travis Carr's testimony.**

There was no due process violation because defendant cannot show Travis Carr perjured himself and, in the alternative, defendant cannot show that the Government knew or should have known that Mr. Carr's testimony was false. In any event, there is not any reasonable likelihood that the testimony could have affected the judgment of the jury.

### 1. **Defendant fails to establish Travis Carr perjured himself.**

To prevail, defendant must first show that Travis Carr perjured himself. ***Napue***, 360 U.S. at 269. The Fourth Circuit has said that a defendant bears a "heavy burden" of showing that a witness testified falsely under ***Napue***. *See **United States v. Griley***, 814 F.2d 967, 971 (4th Cir. 1987). Defendant has not met that heavy burden regarding either part of Travis Carr's challenged testimony.

### a. **Testimony regarding Arrival in West Virginia**

On November 3, 2025, almost five (5) years after the fact, Travis Carr testified on direct examination that he arrived in West Virginia on November 27, 2020. [Doc. 152 at 6]. He testified that he remembered this date because "we had to stay at the Comfort Inn, and I had credit card statements stating that." [Id. at 6–7]. On cross-examination, he testified that he arrived in West Virginia "just before" Thanksgiving. [Id. at 68]. When asked on cross-examination, he agreed that Thanksgiving was on November 26, 2020. [Id. at 69]. This Court later instructed the jury that Thanksgiving was on November 26, 2020. [Id. at 108]. On another occasion, during cross-examination, Mr. Carr answered "I believe so," when asked whether the family came to defendant's office "before Thanksgiving." [Id. at 70]. On yet another occasion, during cross-examination, Mr. Carr testified that he remembered arriving in West Virginia "the day before Thanksgiving." [Id. at 71]. At one point, during cross-examination, Mr. Carr testified "I don't recall," when defendant stated, "you were here the 22nd and you just don't remember." [Id. at 72]. Just after this, he testified "I believe we were," when the defendant said he had testified on direct examination that he was "in Iowa on the 22nd." [Id.].

On this record, Travis Carr did not testify unequivocally that he arrived in West Virginia on November 27, 2020. On cross-examination, he testified on multiple occasions that he arrived in West Virginia before Thanksgiving, i.e., before November 26, 2020. On cross-examination, he did not rule out that they could have arrived on November 22, 2020. He said "I don't recall" when defendant suggested they arrived on that date and only "I believe we were" when defendant stated that he had testified on direct examination that he was in Iowa on that date.

19

Under *Napue*, this type of equivocal testimony is not false. *See*, *e.g.*, *United States v. Briscoe*, 101 F.4th 282, 298–99 (4th Cir. 2024) (credibility issues and contradictions are not equivalent to false testimony; credibility and reliability were for the jury to decide); *Catlin v. Broomfield*, 124 F.4th 702, 741 (9th Cir. 2024) ("Testimony that is simply inconsistent or equivocal may not rise to the requisite level of actual falsity."); *United States v. Robinson*, 68 F.4th 1340, 1352 (D.C. Cir. 2023) ("That Robinson impeached witnesses' testimony does not, as he suggest, connote a *Napue* violation . . . On the contrary, determining the credibility of these witnesses is precisely the role of the jury as factfinder"); *United States v. Williams*, 974 F.3d 320, 355 (3d Cir. 2020) (not false testimony, rather inaccurate testimony was the result of "a faulty memory"); *United States v. Houston*, 648 F.3d 806 (9th Cir. 2011) (witness' lack of clarity not "false"); *United States v. Bailey*, 123 F.3d 1381, 1385–86 (11th Cir. 1997) (memory lapse, unintentional error, or oversight not considered perjury); *United States v. Zuno-Arce*, 44 F.3d 1420, 1420 (9th Cir. 1995) ("Discrepancies in the testimony about the details . . . could as easily flow from errors in recollection as from lies.").

Accordingly, defendant cannot establish that Travis Carr perjured himself when testifying about the arrival date.

### b.  Testimony regarding Nationwide Check

For a different reason, defendant has failed to meet his heavy burden to show Travis Carr perjured himself regarding the Nationwide check, namely: that defendant's paralegal sent Travis Carr a photograph of the check does not establish the knowing falsity of his testimony that Nationwide sent him a letter about the check and that defendant

20

"himself," as he was asked, did not initially tell him about the check.  [Doc. 152 at 20].
Accordingly, defendant cannot establish that Travis Carr perjured himself when testifying
about the Nationwide check.

### 2. Even assuming perjury, defendant fails to establish the Government knew or should have known the testimony was false.

Assuming that Travis Carr's testimony was knowingly false, defendant cannot show
that the Government knowingly used false testimony or knowingly allowed it to go
uncorrected because the Government has demonstrated it did not know, and had no
reason to believe, that the testimony was false.

As presented in the Government's Response to the instant Motion, the Government
did not possess either set of text messages until it received the instant Motion and its
supplement.  The Government provides the following version of events:

On May 19, 2022, Travis Carr voluntarily provided Federal Bureau of
Investigation ("FBI") Special Agent ("SA") Michael Torbic with hard copies of
text messages, including text messages between him and Stacy Nixon. See
[Doc. 174-5], FD-302 dated Nov. 17, 2022.  On May 20, 2022, at Travis
Carr's request, SA Torbic returned the hard copies after making digital
copies, with Travis Carr's permission. Id. The earliest text message between
Travis Carr and Stacy Nixon that was included in these records was dated
June 4, 2021. See [Doc. 174-6], Text Messages dated June 4, 2021. The
government disclosed Attachment 5 and Attachment 6 (along with all the
other text messages received from Travis Carr) to the defendant during
discovery. ([Doc. 63-1] at 4, 18).

21

The copies of text messages that Travis Carr provided to SA Torbic on May 19, 2022, are the only text messages between Travis Carr and Stacy Nixon that were obtained during the investigation from any source, other than the text messages that the defendant attached to his May 16, 2022, court filing, as described above. See Government's Trial Exhibit No. 15.

As for Travis Carr's May 2022 text message in the defendant's Exhibit No. 2 to his motion, stating that he "already sent multiple copies of her iCloud to every law enforcement agency," the government has no idea to what "iCloud" data or what law enforcement agency he is referring, or whether this was simply puffery on his part. What the government knows, beyond any doubt, is that Travis Carr never provided a copy of the November 2020 or the March 2021 text messages to the FBI, nor has the government ever possessed those messages from any other source.[1]

Moreover, for most of the investigation, the government had no knowledge of the purported retainer agreement. The government only became aware of it after the February 2024 lawyer disciplinary panel hearing. Upon obtaining a copy, at that time, nothing on the face of the purported agreement suggested to the government that there would be text messages between Travis Carr and Stacy Nixon on the day of its alleged execution.

---

[1]As Travis Carr testified at trial, he never had any contact with the Internal Revenue Service investigators. [Doc. 152 at 74 ("Well, I never was working with the IRS in this matter.")].

Most significantly, the document purports to have been signed by Thomas Carr, not Travis Carr.

Finally, at no time did Travis Carr give the government reason to believe that he had text messages between him and Stacy Nixon in November 2020 that contradicted his anticipated testimony that the arrival date was on or around November 27, 2020, if he did have them. In fact, even during his trial testimony, he did not mention having already begun text messaging Stacy Nixon before or surrounding his arrival to West Virginia. He testified that upon learning that "the conservator reports were not up to date," he contacted the defendant by email and telephone. ([Doc. 152] at 5). He then testified about what the defendant said during that initial contact. Id. at 6. The government also had no reason to believe, from any of its investigation, that these messages existed.

Similarly, at no time did Travis Carr give the government reason to believe that he possessed the March 2021 text message of a photograph of the Nationwide check, not that this would have made any difference to the investigation, since SA Torbic was primarily investigating the defendant's subsequent misappropriation of the check.

[Doc. 174 at 21–23]. At the March 9, 2026 hearing, SA Torbic provided testimony supporting the notion that the Government did not possess the subject text messages at any time prior to the filings of the instant Motion and Supplement. As such, this Court finds there is no basis for the notion that the Government knew Mr. Carr's testimony was false.

Further, even if Travis Carr had the November 2020 and March 2021 text messages, he was nothing more than an independent, cooperating witness. Therefore, the messages would not have been in the possession of the Government, even constructively. *See United States v. Garcia*, 2021 WL 53198, at *2 (D. N.M. Jan. 6, 2021) ("[I]tems in the possession of witnesses are not in the actual or constructive control or possession of the Government.") (citing *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007)); *United States v. Garcia*, 509 Fed.App'x. 40, 42–43 (2d Cir. 2013) (noting that the Second Circuit "has never held that the 'prosecution team' includes cooperating witnesses"); *United States v. Salahuddin*, 2012 WL 2952436, at *24 (D. N.J. July 19, 2012) (rejecting the defendant's claim that the Government was charged with the knowledge of its cooperating witnesses and state that the defendant failed to "offer any support that the Government can be charged with all knowledge possessed by a cooperating witness"); *United States v. Abdulwahab*, 2011 WL 4434236, at *7 (E.D. Va. Sept. 22, 2011) (Payne, S.J.) ("The United States has no duty under *Brady* to investigate evidence that is under the control of a cooperating witness."); *United States v. Smith*, 2011 WL 2416804, at *4 (E.D. Ky. June 13, 2011) ("the information in question was in the 'possession,' for lack of a better word, of its cooperating witness–not one of the prosecution's own agents. For this reason, the Court is not persuaded that this is an instance where the United States willfully ignored information which it would otherwise have been required to disclose under *Brady* . . . ."); *United States v. Lujan*, 530 F.Supp.2d 1224, 1231 (D. N.M. 2008) (stating there is no affirmative duty to discover information in possession of independent, cooperating witness and not in Government's

24

possession); *United States v. Meregildo*, 920 F.Supp.2d 434, 445 (S.D. N.Y. 2013) (Government did not possess Facebook posts in possession of cooperating witnesses); *United States v. Munchak*, 2014 WL 3557176, at *15 (M.D. Pa. July 17, 2014) (rejecting cooperating witness as part of the prosecution team).

Ultimately, even assuming falsity, "the evidence . . . does not establish that the [G]overnment knew, or should have known, that [the] testimony was false. At most[, regarding the arrival testimony,] two conflicting versions of the incident were presented to the jury." *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (citation omitted). Travis Carr testified that he did not think, although he admitted he did not recall, that they had arrived on November 22, 2020. Stacy Nixon testified that the family arrived on November 22, 2020. The guilty verdict does not necessarily mean that the jury unanimously agreed on a version of the arrival. As explained below, in discussing materiality, what must have been more important to the jury was whether Thomas Carr, in fact, signed such an agreement, and even if he did, whether defendant, in fact, earned the $300,000 in 56 days. Similarly, what must have been more important to the jury regarding the Nationwide check was whether defendant misappropriated the funds.

Accordingly, assuming falsity, defendant cannot establish that the Government knew, or should have known, that the testimony was false.

### 3. There is not any reasonable likelihood that the testimony could have affected the judgment of the jury.

For the reasons articulated below, there is not any reasonable likelihood that the testimony could have affected the judgment of the jury.

### a. Testimony regarding Arrival in West Virginia

At the start, the equivocal nature of Travis Carr's testimony as to the arrival date, as outlined above, was not reasonably likely to have caused the jury to adopt his version of the timing of the arrival. *See **United States v. O'Keefe***, 128 F.3d 885, 899 (5th Cir. 1997) (discussing how an effective cross-examination tends to negate materiality). This likelihood is even less when considering the jury heard a different version from Stacy Nixon. *See **Geston***, 299 F.3d at 1135.

What is more, the timing of the arrival was not reasonably likely to have had the effect on the jury that defendant suggests. Rather, it is more likely the jury focused on more material fact-finding questions, including (1) whether Thomas Carr signed the agreement, (2) whether there was a reasonable basis to believe that Thomas Carr had criminal exposure for his tax failings, (3) whether the $300,000 was the retainer referenced in the agreement, and (4) whether defendant earned the $300,000 in 56 days, including to justify the nearly daily transfers and transfers of $50,000, $25,000 (twice), and $20,0000, in December 2020.

On the issue of whether Thomas Carr signed the agreement, that is where Travis Carr was unequivocal. He testified the had not seen the agreement until trial preparation with the Government. [Doc. 152 at 8–9]. He had not seen his father receive, sign, or send the agreement. [Id. at 9–10]. While he admitted he and his family came to defendant's office upon their arrival to West Virginia, he rejected defendant's version during cross examination. [Id. at 69–71]. He testified that he recalled sitting with Brittany Carr in

defendant's conference room and that Thomas Carr was out in their vehicle, but he did not recall defendant going out to the vehicle to meet with Thomas. [Id.].

Most significantly, when considering whether the Government proved wire fraud based on the transfer of the $300,00 (Count 17) and defendant's use of those funds to make a payment on his wife's credit card account (Count 18), it is reasonably likely that the jury focused more on defendant's proffered reasons for obtaining the $300,000 and his extremely quick expenditure of the money than on whether Thomas Carr, in fact, signed the retainer agreement.

In other words, without regard to the execution of the agreement, it is reasonably likely that the jury concluded that defendant had not earned $300,000 in 56 days solely for preparing some far-fetched criminal defense, especially because the jury received in evidence the defendant's own written statements that he was not charging "fees related to the preparation of the conservatorship accounting reports and assisting the Certified Public Accountant with delinquent tax filings." *See* Government's Trial Exhibit No. 17. After all, if the allegedly potential criminal offense is misdemeanor failure to file and failure to pay tax, there is nothing else that can conceivably prepare a criminal defense other than filing the returns and paying the taxes, except for presenting mitigating factors, such as Jackie Carr died, Thomas Carr was a stroke survivor, and Brittany Carr is mentally handicapped. Certainly, preparing a mitigating case would not cost $300,000 in 56 days, including $50,000 on a single day, and require a payment on defendant's wife's credit card account.

Accordingly, there is not any reasonable likelihood that Travis Carr's testimony regarding the arrival date could have affected the judgment of the jury.

### b. Testimony regarding Nationwide Check

Travis Carr's testimony that defendant "himself" did not initially tell him about the Nationwide check is unlikely to have had any effect on the jury, first because he immediately thereafter testified that he had discussed the check with defendant "[a]fter a while." [Doc. 152 at 20].

What reasonably likely had more of an effect on the jury, when considering whether the mailing of the Nationwide check was in furtherance of the fraud scheme (Count 1), was (1) the written fee agreement in which defendant agreed to keep only 40% of his fee, (2) the certified business records showing that defendant converted to his own use all the proceeds without authorization, (3) the May 2022 court filing in which defendant falsely stated that he used the Nationwide proceeds to pay the Carr's delinquent taxes, (4) the August 2023 administrative proceeding filing in which defendant falsely stated that he used the Nationwide proceeds to pay the delinquent taxes, and (5) the excerpts of the transcript of his February 2024 administrative hearing testimony in which defendant falsely testified that he used the Nationwide proceeds to pay the delinquent taxes.

Accordingly, there is not any reasonable likelihood that Travis Carr's testimony regarding his initial knowledge of the Nationwide check could have affected the judgment of the jury.

Therefore, this Court will not set aside any convictions because defendant has failed to establish a due process violation under **Napue**.

28

## IV. <u>CONCLUSION</u>

For the reasons as stated herein, including but not limited to the lack of bad faith on the part of the Government and the lack of due diligence on the part of defendant, defendant's Motion [**Doc. 170**] is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein and is further directed to provide a copy to the *pro se* defendant via the CM/ECF system.

**DATED**: March 10, 2026.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

29